RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DINO RIKOS et al.,

                *Plaintiffs-Appellees,*

    *v.*

THE PROCTER & GAMBLE COMPANY,

                *Defendant-Appellant.*

No. 14-4088

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:11-cv-00226—Timothy S. Black, District Judge.

Argued: June 16, 2015

Decided and Filed: August 20, 2015

Before: MOORE and COOK, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Brian J. Murray, JONES DAY, Chicago, Illinois, for Appellant. Timothy G. Blood, BLOOD HURST & O'REARDON, San Diego, California, for Appellees. **ON BRIEF:** Brian J. Murray, JONES DAY, Chicago, Illinois, D. Jeffrey Ireland, FARUKI IRELAND & COX P.L.L., Cincinnati, Ohio, Joanne Lichtman, BAKER & HOSTETLER LLP, Cleveland, Ohio, Chad A. Readler, Rachel Bloomekatz, JONES DAY, Columbus, Ohio, for Appellant. Timothy G. Blood, Leslie E. Hurst, Thomas J. O'Reardon II, BLOOD HURST & O'REARDON, San Diego, California, for Appellees.

     MOORE, J., delivered the opinion of the court in which COHN, D.J., joined. COHN, D.J. (pg. 37), delivered a separate concurring opinion. COOK, J. (pp. 38–40), delivered a separate dissenting opinion.

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  The named plaintiffs-appellees ("Plaintiffs") are three individuals who purchased Align, Procter & Gamble's ("P&G") probiotic nutritional supplement, and found that the product did not work as advertised—that is, it did not promote their digestive health.  Plaintiffs subsequently brought suit, alleging violations by P&G of various state unfair or deceptive practices statutes because it has not been proven scientifically that Align promotes digestive health for *anyone*.  On June 19, 2014, the district court certified five single-state classes from California, Illinois, Florida, New Hampshire, and North Carolina under Federal Rule of Civil Procedure 23(b)(3) comprised of "[a]ll consumers who purchased Align . . . from March 1, 2009, until the date notice is first provided to the Class."  On appeal, P&G contends that the district court abused its discretion in granting Plaintiffs' motion for class certification.  For the reasons set forth below, we **AFFIRM** the district court's judgment granting class certification to Plaintiffs.

**I. BACKGROUND**

**A. Facts**

Align contains a patented probiotic strain, *Bifidobacterium infantis 35624* ("Bifantis"), which it developed in the 1990s and early 2000s in partnership with Alimentary Health, a company based in Ireland.  Sealed App. at 497.  According to the World Health Organization, probiotics are "live microorganisms . . . which when administered in adequate amounts confer a health benefit to the host."  R. 108-8 (Komanduri Decl. ¶ 12) (Page ID #1596).  "While there is a consensus within the medical and scientific communities that utilizing bacteria as a therapeutic measure in human disease is promising, current knowledge of the use of bacteria for these purposes remains fairly primitive."  *Id.* ¶ 13 (Page ID #1596).  Although a limited number of probiotics have been approved as prescription treatments for pouchitis and infectious diarrhea, the overall "[m]edical understanding of probiotics in humans is still in its infancy."  *Id.* ¶¶ 13–14 (Page ID #1596–97).

Align is not a prescription probiotic. Instead, it is marketed to the general public as a supplement that "naturally helps build and support a healthy digestive system, maintain digestive balance, and fortify your digestive system with healthy bacteria." Appellant Br. at 12 (alterations omitted). In addition, unlike some other non-prescription probiotics, Align is not included as an add-on ingredient to another consumer product (e.g., yogurt), but is rather sold in a capsule that is "filled with bacteria and [otherwise] inert ingredients." R. 140 (Dist. Ct. Order at 30) (Page ID #6444).

P&G began selling Align in various test markets in October 2005, with sales representatives dropping off samples to doctors' offices in St. Louis, Boston, and Chicago. Sealed App. at 410. P&G was also able to sell a limited amount of product online, although "physician-driven sales outpaced internet-driven sales by about 2:1." *Id.* One of the initial hurdles faced by P&G was convincing consumers of the product's value, particularly given Align's premium price point. *See id.* at 535 (company document noting that "[v]alue is a trial barrier due to the premium price point of $29.99. Probiotics on shelf at major retailers range from $9.99-$29.99. Of note, other probiotics *detailed through physicians* cost upwards of $45") (emphasis added). After a successful rollout across multiple markets, P&G launched Align nationwide in 2009, promoting Align through a comprehensive advertising campaign, which included in-person physician visits, television and print advertisements, in-store displays, and product packaging. Appellant Br. at 11–12.

**B. Procedural History**

Dino Rikos, Tracey Burns, and Leo Jarzembrowski, the named plaintiffs-appellees, are residents of Illinois, Florida, and New Hampshire, respectively. From 2009 to 2011, Rikos, Burns, and Jarzembrowski were "exposed to and saw Procter & Gamble's claims by reading the Align label." R. 85 (Second Amended Class Action Compl. ¶¶ 10–12) (Page ID #963–64). In reliance on P&G's claims of Align's effectiveness, they proceeded to purchase Align at various stores in California, Illinois, North Carolina, Florida, and New Hampshire.

In their complaint, Plaintiffs allege that they "suffered injury in fact and lost money as a result of the unfair competition described [t]herein" after finding that Align did not provide them with the digestive benefits that it promised to provide. *Id.* Plaintiffs initially filed suit in the

United States District Court for the Southern District of California, but the case was eventually transferred to the Southern District of Ohio.  R. 25 (S.D. Cal. Dist. Ct. Order at 4) (Page ID #374).  In January 2014, Plaintiffs filed a motion and memorandum in support of class certification.  Sealed App. at 15–63.  In their motion, Plaintiffs requested that the district court certify the following five single-state classes and appoint them as class representatives:

> *California Class (Represented by Plaintiff Dino Rikos)*:  All consumers who purchased Align in California from March 1, 2009, until the date notice is first provided to the Class.
>
> *Illinois Class (Represented by Plaintiff Dino Rikos)*:  All consumers who purchased Align in Illinois from March 1, 2009, until the date notice is first provided to the Class.
>
> *Florida Class (Represented by Plaintiff Tracey Burns)*:  All consumers who purchased Align in Florida from March 1, 2009, until the date notice is first provided to the Class.
>
> *New Hampshire Class (Represented by Plaintiff Leo Jarzenbowski* [sic]*)*:  All consumers who purchased Align in New Hampshire from March 1, 2009, until the date notice is first provided to the Class.
>
> *North Carolina Class (Represented by Plaintiff Tracey Burns)*:  All consumers who purchased Align in North Carolina from March 1, 2009, until the date notice is first provided to the Class.
>
> Excluded from each of the Classes are the defendant, its officers, directors, and employees, and those who purchased Align for the purpose of resale.

*Id.* at 16.

After hearing oral argument from both sides, the district court issued an order granting Plaintiffs' motion for class certification.  In its order, the district court made clear that it was not attempting to provide a ruling on the merits of the case (i.e., whether or not Align promotes digestive health), but was instead reviewing only whether Plaintiffs had presented sufficient evidence to satisfy Federal Rule of Civil Procedure 23.  R. 140 (Dist. Ct. Order at 5–6) (Page ID #6419–20).  It then determined that class certification was proper.  *Id.* at 1, 38 (Page ID #6415, 6452).  P&G has timely appealed.

## II. ANALYSIS

### A. Standard of Review

"Class certification is appropriate if the [district] court finds, after conducting a 'rigorous analysis,' that the requirements of Rule 23 have been met." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (quoting *Walmart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). Nonetheless, we have noted that "[t]he district court maintains substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559 (6th Cir. 2007) (internal quotation marks omitted). We review the district court's decision to grant or deny class certification under an abuse-of-discretion standard. *Id.* "An abuse of discretion occurs when we are left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where it improperly applies the law or uses an erroneous legal standard." *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (alterations in original) (internal quotation marks omitted).

### B. Rule 23(a)[1]

#### 1. Plaintiffs Have Sufficiently Demonstrated Commonality

Federal Rule of Civil Procedure 23(a)(2) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . there are questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 131 S. Ct. at 2551 (internal quotation marks omitted).

P&G contends that, like the plaintiffs in *Dukes*, Plaintiffs here have failed sufficiently to demonstrate commonality. According to P&G, *Dukes* requires that named plaintiffs present evidence proving that class members suffered an actual common injury to establish commonality. Appellant Br. at 25–26. P&G argues that Plaintiffs here have presented only

---

[1]P&G has not challenged on appeal two other requirements of Federal Rule of Civil Procedure 23(a), numerosity and adequacy of representation.

anecdotal evidence that Align does not work *for them*—Plaintiffs have "presented no evidence that the reported consumer benefits [of Align to all purchasers] were due solely to the placebo effect." *Id.* at 29. Instead, P&G claims that "consumer satisfaction—and repeat purchasing—is probative of Align's benefits to consumers." *Id.* In addition, P&G notes that at least some studies appear to conclude that Align is effective in promoting digestive health.[2]

P&G misconstrues Plaintiffs' burden at the class-certification stage. Whether the district court properly certified the class turns on whether Plaintiffs have shown, for purposes of Rule 23(a)(2), that they *can prove*—not that have already shown—that all members of the class have suffered the "same injury." *Dukes*, 131 S. Ct. at 2551. The Supreme Court in *Dukes* did not hold that named class plaintiffs must prove at the class-certification stage that all or most class members were in fact injured to meet this requirement. Rather, the Court held that named plaintiffs must show that their claims "depend upon a common contention" that is "of such a nature that it is *capable* of classwide resolution—which means that determination of its truth or falsity *will* resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* (emphases added). In other words, named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case.

Since *Dukes*, the Supreme Court has made clear that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—*but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (emphasis added); *see also In re Whirlpool*, 722 F.3d at 851–52 ("[D]istrict courts may not turn the class certification proceedings into a dress rehearsal for the trial on the merits." (internal quotation marks omitted)); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (explaining that although "conformance with Rule 23(a) . . . must be checked through rigorous analysis, . . . it is not always necessary . . . to probe behind the pleadings before coming to rest on the certification

---

[2]Although not relevant to the commonality inquiry, Plaintiffs point to flaws in the scientific studies relied upon by P&G that Plaintiffs claim mean that it has not been proven with proper scientific analysis that Align works for anyone who takes it. *See, e.g.*, Sealed App. at 42–44.

question, because sometimes there may be no disputed factual and legal issues that strongly influence the wisdom of class treatment" (internal quotation marks omitted)).

A brief overview of the class claims in *Dukes* illustrates the Supreme Court's more limited holding than what P&G claims.  The named plaintiffs were "three current or former Wal-Mart employees who allege[d] that the company discriminated against them on the basis of their sex by denying them equal pay or promotions, in violation of Title VII of the Civil Rights Act of 1964."  *Dukes*, 131 S. Ct. at 2547.  They sought to have a class certified of "[a]ll women employed at any Wal-Mart domestic retail store at any time since December 26, 1998, who have been or may be subjected to Wal–Mart's challenged pay and management track promotions policies and practices."  *Id.* at 2549 (internal quotation marks omitted).  Significantly, "[t]hese plaintiffs . . . [did] not allege that Wal–Mart ha[d] any express corporate policy against the advancement of women."  *Id.* at 2548.  Rather, plaintiffs "claim[ed] that the discrimination to which they have been subjected [was] common to *all* [of] Wal–Mart's female employees" because "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal–Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice."  *Id.*

The Supreme Court rejected this theory, finding that the plaintiffs had failed to demonstrate that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  After reviewing the details of Wal-Mart's discretionary promotion policy, the Court noted that, "[i]n such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's."  *Dukes*, 131 S. Ct. at 2554.  Thus, "[a] party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions."  *Id.*  The plaintiffs, the Court noted, had presented no evidence that managers at Wal-Mart had exercised their discretion in the same way—i.e., that they had used it to discriminate against women.  It would have been possible for some managers to discriminate in favor of women, for others to discriminate against women, and for still others not to discriminate at all.  *Id.*

Here, in contrast, Plaintiffs have identified a common question—whether Align is "snake oil" and thus does not yield benefits to *anyone*, Appellee Br. at 7—that will yield a common answer for the entire class and that, if true, will make P&G liable to the entire class. The district court conducted a sufficient analysis of the record evidence in finding commonality here. It concluded that no individual would purchase Align but-for its digestive health benefits, which P&G promoted through an extensive advertising campaign. If Align does not provide any such benefits, then every class member was injured in the sense that he or she spent money on a product that does not work as advertised. No more investigation into the merits (i.e., whether Align actually works) is needed for purposes of satisfying Rule 23(a)(2)'s commonality requirement.[3] Thus, although P&G argues that some class members were not injured because they kept buying Align—a sign that Align works, says P&G—that is not the right way to think about "injury" in the false-advertising context. The false-advertising laws at issue punish companies that sell products using advertising that misleads the reasonable consumer. *See, e.g.,* *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("Appellants' claims under these California statutes [the Unfair Competition Law and the Consumer Legal Remedies Act] are governed by the 'reasonable consumer' test. . . . Under the reasonable consumer standard, Appellants must show that members of the public are likely to be deceived." (internal quotation marks omitted)). Whether consumers were satisfied with the product is irrelevant. *See, e.g.,* *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) ("Defendant's concern that some putative class members were happy with Elations and thus were uninjured is unpersuasive. The requirement of concrete injury is satisfied when the Plaintiffs and class members . . . suffer an economic loss caused by the defendant, namely the purchase of defendant's product containing misrepresentations." (alteration and

---

[3]Neither *FTC v. Pantron I Corporation*, 33 F.3d 1088 (9th Cir. 1994), nor *In re Whirlpool* support P&G's argument that the district court did not sufficiently consider the merits of the case to grant class certification. *Pantron* was not a class action, and thus the decision cited conducts a full merits analysis. The evidence we noted that the district court properly considered in *In re Whirlpool* related to whether there was in fact a common question *capable* of a common answer. Specifically, we highlighted evidence that confirmed that mold the class claimed was due to design defects in Whirlpool products occurred "despite variations in consumer laundry habits." 722 F.3d at 854. Such evidence was critical to disproving Whirlpool's claim that "proof of proximate cause must be determined individually for each plaintiff in the class," i.e., that the class's common question would not yield a common answer. *Id.* Significantly, however, we did not examine whether the named plaintiffs had presented evidence that the alleged design defects in Whirlpool products had in fact proximately caused the mold of which they complained. That issue went solely to the merits of the case. Similarly, the evidence P&G has presented here that it claims the district court insufficiently examined goes solely to the merits of the case, not to whether Plaintiffs' common question will yield a common answer.

internal quotation marks omitted)).  In fact, courts have held that it is misleading to state that a product is effective when that effectiveness rests solely on a placebo effect.  *See, e.g.*, *FTC v. Pantron I Corporation*, 33 F.3d 1088, 1100–01 (9th Cir. 1994).

P&G has failed to identify a single false-advertising case where a federal court has denied class certification because of a lack of commonality.  *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) ("A common question with respect to the first theory of liability is whether EZ Seed grows grass.  If plaintiffs can prove EZ Seed 'does not grow at all' and thus is worthless, plaintiffs will be entitled to relief."); *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("By definition, all class members were exposed to such representations and purchased AriZona products, creating a common core of salient facts.  Courts *routinely find commonality in false advertising cases* that are materially indistinguishable from the matter at bar." (emphasis added) (internal quotation marks and citation omitted)); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (distinguishing *Dukes* from consumer false-advertising class actions by noting that "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question. . . .  In this case, the plaintiffs' claims and those of the class they would like to represent all derive from a single course of conduct by Sturm:  the marketing and packaging of GSC").

In addition, as Plaintiffs point out, every court has, when presented with the opportunity, found commonality sufficient to satisfy Rule 23(a)(2) where plaintiffs have alleged that probiotics are ineffective.  *See, e.g.*, *Johnson v. Gen. Mills, Inc.*, 278 F.R.D. 548, 551 (C.D. Cal. 2012) ("Mr. Johnson has presented sufficient facts to show that all of the class members' claims have at their heart a common contention:  Defendants made a material misrepresentation regarding the digestive health benefits of YoPlus that violated the UCL and the CLRA.  The class members all assert they were misled by a common advertising campaign that had little to no variation."); *Wiener v. Dannon Co.*, 255 F.R.D. 658, 664–65 (C.D. Cal. 2009) ("The proposed class members clearly share common legal issues regarding Dannon's alleged deception and misrepresentations in its advertising and promotion of the Products.").

In *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011), for instance, plaintiff Julie Fitzpatrick brought suit under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") against General Mills, alleging that the company had made "false and misleading claims that YoPlus provides digestive health benefits that other yogurt products do not." *Id.* at 1281. "YoPlus is ordinary yogurt supplemented with probiotic bacteria, inulin, and vitamins A and D. The mixture of probiotic bacteria and inulin in YoPlus allegedly provides habitual consumers with digestive health benefits by aiding in the promotion of digestive health." *Id.* Fitzpatrick moved to certify a class of "all persons who purchased YoPlus in the State of Florida." *Id.* The district court granted Fitzpatrick's motion. *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687 (S.D. Fla. 2010). On the issue of commonality, the district court explained "[w]hether General Mills' claim that Yo–Plus aids in the promotion of digestive health is 'deceptive' is a mixed question of law and fact common to every class member seeking damages under the FDUTPA." *Id.* at 696. The district court continued that "[e]ven though a few consumers likely purchased Yo–Plus for reasons unrelated to Yo–Plus' purported digestive health benefits, . . . the Court is convinced that a significant number of Yo–Plus consumers purchased Yo–Plus because of its purported digestive health benefit, which is, as General Mills' marketing documents plainly state, Yo–Plus' primary distinguishing feature." *Id.* at 696–97. The Eleventh Circuit did not discuss the commonality requirement on appeal. *Fitzpatrick*, 635 F.3d at 1282. It did note, however, that "[t]he district court's analysis . . . [was] sound and in accord with federal and state law." *Id.* at 1283.[4]

As the preceding false-advertising cases make clear, the district court correctly found that Plaintiffs have demonstrated that their claims share a common question—whether Align is "snake oil" and thus does not yield benefits to *anyone*. Appellee Br. at 7. That common question will yield a common answer for the entire class that goes to the heart of whether P&G will be found liable under the relevant false-advertising laws. That is all *Dukes* requires.

---

[4]The Eleventh Circuit ultimately vacated the district court's decision and remanded the case to the district court, but for a reason unrelated to its commonality findings. The district court's "class definition limit[ed] the class to those who purchased YoPlus 'to obtain its claimed digestive health benefit,' which takes into account individual reliance on the digestive health claims." 635 F.3d at 1283. However, the Eleventh Circuit found that proof of individual reliance is unnecessary under the relevant law in Florida (a claim evaluated in more detail below), and thus the district court's "analysis would lead one to believe that the class [sh]ould be defined as 'all persons who purchased YoPlus in the State of Florida.'" *Id.* n.1.

## 2. Plaintiffs' Claims Are Typical Of The Class

Federal Rule of Civil Procedure 23(a)(3) requires plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." As the Supreme Court made clear in *Dukes*, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." 131 S. Ct. at 2551 n.5 (alteration in original) (internal quotation marks omitted); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7A Federal Practice and Procedure § 1764 (3d ed. 2005) ("Thus, many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory. Of course, when this is true the typicality standard is closely related to the test for the common-question prerequisite in subdivision (a)(2)." (footnotes omitted)). Indeed, in challenging the district court's finding of typicality, P&G largely repeats its arguments against commonality. Appellant Br. at 30–32.

P&G does appear to make a slight variation of its consumer-satisfaction argument by contending that "many of the unnamed class members have no interest in pursuing restitution, nor in crippling the product. Indeed, this lawsuit may be *antithetical* to their interests." *Id.* at 31. The district court considered and rejected this argument in its order granting class certification. *See* R. 140 (Dist. Ct. Order at 19) (Page ID #6433) ("Defendant advertised to all that the proprietary probiotic bacteria in Align provides proven digestive health benefits. The question is not whether each class member was satisfied with the product, but rather whether the purchaser received the product that was advertised."). The district court's conclusion is consistent with those of other district courts who have reviewed similar arguments. *See, e.g.*, *Johnson*, 278 F.R.D. at 552 ("Both Mr. Johnson's and the fourth generation purchasers' claims center on the assertion that in deciding to purchase YoPlus they relied to their detriment on the allegedly false digestive health message communicated by Defendants. Mr. Johnson's claims are, therefore, 'reasonably co-extensive' with those of the fourth generation purchasers, and he satisfies the typicality requirement."). Consistent with its findings on commonality, the district court did not abuse its discretion in finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

**C. Rule 23(b)(3): Plaintiffs Have Demonstrated That Common Questions Will Predominate Over Individualized Inquiries In Assessing the Merits of Their Claims**

"[E]ach class meeting [the] prerequisites [of Rule 23(a)] must also pass at least one of the tests set forth in Rule 23(b)." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). Plaintiffs have sought certification under Federal Rule of Civil Procedure 23(b)(3), which states that a class action may be maintained only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."[5]

P&G contends that the district court erred in four separate but related ways. First, it alleges that some individuals were not actually exposed to P&G's marketing campaign—that some individuals purchased Align upon receiving advice from a family member, friend, or physician. Second, it claims that, under the state laws at issue, individual issues of causation and reliance predominate over the common questions that allegedly affect all members of the class. Third, P&G claims that Align does actually work for many purchasing it, and thus Plaintiffs cannot prove injury on a classwide basis. Finally and relatedly, P&G claims that Plaintiffs' damages model is inconsistent with their theory of liability and that individual calculation of damages will be necessary.

**1. Actual Exposure**

According to P&G, "significant numbers of consumers became aware of and purchased Align based on sources of information *unrelated* to the advertising at issue," and thus individual proof that class members purchased Align because of its advertising will be necessary, thereby defeating predominance. Appellant Br. at 40. P&G contends that "[d]octors do not simply recommend Align based on P&G's professional marketing. Doctors make independent decisions based on their review of the science, experience, and expertise." Appellant Reply Br. at 25. In support of its point, P&G relies on *Minkler v. Kramer Laboratories, Inc.*, No. 12-9421, 2013 WL

---

[5]P&G has not challenged on appeal the district court's holding that the other element of Rule 23(b)(3) is met, "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

3185552, at *4 (C.D. Cal. Mar. 1, 2013), and *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).

These cases are, however, readily distinguishable from the case at hand. In *In re American Medical Systems*, we made clear that our decision to vacate the district court's conditional certification order was based "on the extraordinary facts of [the] case." 75 F.3d at 1074. In that case, the plaintiff brought suit over alleged defects in a number of different prosthetic devices, although the plaintiff had problems only with one of the ten types of prosthetics manufactured by American Medical Systems. We determined class certification to be inappropriate because we held that the claims at issue—strict liability; fraudulent misrepresentation; negligent testing, design, and manufacture; and failure to warn—would "differ depending upon the model and the year [the prosthetic] was issued." *Id.* at 1081. "Proof[] . . . will also vary from plaintiff to plaintiff because complications with an AMS device may be due to a variety of factors, including surgical error, improper use of the device, anatomical incompatibility, infection, device malfunction, or psychological problems." *Id.* Thus, on the issue of predominance, we noted that, "[a]s this case illustrates, the products are different, each plaintiff has a unique complaint, and each receives different information and assurances from his treating physician. Given the absence of evidence that common issues predominate, certification was improper." *Id.* at 1085.

*Minkler*—an unpublished district court decision from a court outside of the Sixth Circuit—involved a plaintiff seeking certification of a class consisting of "[a]ll persons domiciled or residing in the State of California who ha[d] purchased a Fungi–Nail anti-fungal product." 2013 WL 3185552, at *1. The plaintiff purchased Fungi-Nail in order to treat some discoloration of his toenail, which he believed was a nail fungus. *Id.* In finding class certification inappropriate, the district court did note that some members of the proposed class purchased Fungi-Nail based "on the recommendations of physicians or pharmacists, and the appearance of the products' packaging would not have been important to their purchasing decision." *Id.* at *4. Yet the district court also noted that "Fungi–Nail is marketed for use as a treatment for ringworm, athlete's foot and other conditions that can appear in places other than 'on nails.'" *Id.* It was not, in other words, necessarily even marketed for treatment of the

plaintiff's condition, and "Defendants [even] raise[d] significant doubts as to whether Plaintiff actually ha[d] a fungal infection." *Id.*

The facts in this case paint a far different picture. Unlike the plaintiff in *American Medical Systems*, Plaintiffs here do not take aim at a panoply of P&G products. They focus their attention on Align. Plaintiffs all purchased Align because it allegedly promoted digestive health. That is the only reason to buy Align. In addition, Plaintiffs here have produced evidence showing that P&G undertook a comprehensive marketing strategy with a uniform core message, even if its packaging has changed somewhat over time: buy Align because it will help promote your digestive health. *See* Sealed App. at 253–55. That marketing campaign focused on physician recommendations, with many sales representatives dropping off samples in various doctors' offices over a multi-year period. *Id.* at 255.

The district court's decision to certify the proposed class is also in accord with the decision of courts in other consumer-products class action cases. In *Johnson*, for instance, the plaintiff—like Plaintiffs here—"presented evidence demonstrating that Defendants marketing campaign was prominent *and not limited to statements made on the YoPlus packaging*." 278 F.R.D. at 551 (emphasis added). The *Johnson* court made clear that the form of presentation was irrelevant: "Regardless of how the message was communicated, the claims brought by Mr. Johnson on behalf of the class under the UCL and the CLRA center around a common question: Did Defendants state a false claim of a digestive health benefit that a reasonable person would have been deceived by, for purposes of the UCL, or would have attached importance to, for purposes of the CLRA?" *Id.* Likewise, in *Wiener*, defendant Dannon "contend[ed] that a class-wide inference of proof is not appropriate in this case, because purchasers were not uniformly exposed to Dannon's advertising claims and the materiality of the misrepresentation is an issue unique to each purchaser, as Dannon's consumer surveys show that purchasers bought the Products for different reasons." 255 F.R.D. at 668. Echoing the language in *Johnson*, the district court held that "[r]egardless of whether every class member was exposed to Dannon's television, print, and internet advertisements, the record clearly establishes that Dannon's alleged misrepresentations regarding the clinically proven health benefits of the Products are prominently displayed on all of the Products' packaging, a fact that Dannon has never

contested." *Id.* at 669. "Because, by definition, every member of the class must have bought one of the Products and, thus, seen the packaging, Plaintiffs have succeeded in showing that the alleged misrepresentations were made to all class members." *Id.*; *see also In re ConAgra Foods, Inc.*, No. CV 11-05379 MMM, 2015 WL 1062756, at *46 (C.D. Cal. Feb. 23, 2015) (noting that "it is undisputed that ConAgra made the same alleged misrepresentation on each bottle of Wesson Oils purchased by class members" in finding predominance on the issue of causation/reliance).

The facts at issue in *Johnson* and *Wiener* are identical to the ones at issue here. Regardless of how customers first heard about Align—whether through P&G's direct advertising campaign, through a physician who had learned about Align through a P&G sales representative, or through a friend or family member who had used Align—they nonetheless decided to purchase the product only for its purported health benefits. Although P&G contends that a doctor could recommend Align based on "her independent judgment," that argument is belied by the fact that P&G developed Bifantis, the probiotic behind Align, and P&G, in turn, developed the marketing campaign to promote Align. In light of this point, the *Johnson* and *Wiener* decisions, and the differences between the facts at issue here and the facts in *American Medical Systems* and *Minkler*, the district court did not abuse its discretion in rejecting P&G's contention that certain class members did not rely on P&G advertising in making their decision to buy Align.

## 2. State Laws

On a related point, P&G also claims that Plaintiffs cannot prove reliance and causation, which P&G claims are required by the false-advertising laws at issue, on a classwide basis. Appellant Br. at 41. We examine each of these false-advertising laws below. We conclude that, under each of the five laws, Plaintiffs can prove causation and/or reliance on a classwide basis provided that (1) the alleged misrepresentation that Align promotes digestive health is material or likely to deceive a reasonable consumer, and (2) P&G made that misrepresentation in a generally uniform way to the entire class.

### a. California

Rikos seeks "certification of claims arising under Cal. Bus. & Prof. Code § 17200 (California's Unfair Competition Law or 'UCL'), Cal. Civ. Code § 1750 (California's Consumers Legal Remedies Act or 'CLRA'), and breach of express warranty." Sealed App. at 19–20. None of these causes of action require individualized proof of reliance or causation such that classwide proof will never suffice.

In *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009), the California Supreme Court held that, "[t]o state a claim under . . . the UCL . . . based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Id.* at 29 (internal quotation marks omitted). "[T]he UCL's focus [is] on the defendant's conduct . . . in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Id.* at 30. Thus "relief under the UCL is available without individualized proof of deception, reliance and injury" for absent class members. *Id.* at 35. Plaintiffs thus need not show that every purchaser of Align in California relied on the product's advertising. Courts have qualified, however, that if the defendant made disparate misrepresentations to the class, then there still may be issues of predominance. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) ("We do not, of course, suggest that predominance would be shown in every California UCL case. For example, it might well be that there was no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant. *See, e.g.*, . . . *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 849–50 (2009).").

It is true that, "[u]nlike the UCL, . . . plaintiffs in a CLRA action [must] show not only that a defendant's conduct was deceptive but that the deception caused them harm." *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (Cal. Ct. App. 2002). However, "[c]ausation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class." *Id.* (internal quotation marks omitted). Thus, "plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all. . . . '[I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class.'" *Id.* at

1292–93 (quoting *Vasquez v. Superior Court*, 484 P.2d 964, 973 (Cal. 1971)). Materiality is measured by an objective standard: "[m]ateriality of the alleged misrepresentation generally is judged by a reasonable man standard. In other words, a misrepresentation is deemed material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (Cal. Ct. App. 2010), *as modified on denial of reh'g* (Feb. 8, 2010) (internal quotation marks omitted); *see also Stearns*, 655 F.3d at 1022–23; *In re ConAgra Foods*, 2015 WL 1062756, at *34.

Finally, proof of individualized reliance or causation is not necessary under California law to establish breach of an express warranty. Under California law, "[a]n express warranty is a term of the parties' contract." *In re ConAgra Foods*, 2015 WL 1062756, at *35. "Product advertisements, brochures, or packaging can serve to create part of an express warranty." *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012). "[T]o prevail on a breach of express warranty claim, the plaintiff must prove (1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (Cal. Ct. App. 2010) (internal quotation marks omitted). "Proof of reliance on specific promises or representations is not required."[6] *In re ConAgra Foods*, 2015 WL 1062756, at *35 (and citing cases); *see also Weinstat,* 180 Cal. App. 4th at 1227 ("The lower court ruling rests on the incorrect legal assumption that a breach of express warranty claim requires proof of prior reliance. While the tort of fraud turns on inducement, as we explain, breach of express warranty arises in the context of contract formation in which reliance plays no role."); *Rosales,* 882 F. Supp. 2d at 1178 ("Product advertisements, brochures, or packaging can serve to create part of an express warranty. While this does not require that plaintiff relied on the individual advertisements, it does require that plaintiff was actually exposed to the advertising.").

---

[6]The case cited by P&G that states that reliance is required cites a decision that predates California's Uniform Commercial Code ("UCC"). *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (Cal. Ct. App. 1986) ("In order to plead a cause of action for breach of express warranty, one must allege the exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach of that warranty which proximately causes plaintiff injury. (See *Burr v. Sherwin Williams Co.* (1954) 42 Cal. 2d 682 . . . .")). Section 2313 of California's UCC governs breach of express warranty claims. *Weinstat*, 180 Cal. App. 4th at 1227. However, as the *Weinstat* court explained, although "[p]re-Uniform Commercial Code law governing express warranties required the purchaser to prove reliance on specific promises made by the seller," a close analysis of the text and official comments to the UCC reveals that "[t]he Uniform Commercial Code . . . does not require such proof." *Id.*

However, "class treatment of breach of express warranty claims is only appropriate if plaintiffs can demonstrate that the alleged misrepresentation would have been material to a reasonable consumer." *In re ConAgra Foods*, 2015 WL 1062756, at *36.

### b. Illinois

Rikos also seeks "certification of claims arising under the Illinois Consumer Fraud and Deceptive Business Practices Act ('ICFA')." Sealed App. at 20. A claim under the ICFA requires: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009). When the deceptive act alleged is a misrepresentation, that misrepresentation must be "material" and "is established by applying a reasonable person standard." *In re ConAgra Foods*, 2015 WL 1062756, at *45. Reliance is not required to establish an ICFA claim. *Id.* (citing cases). However, to establish the last two elements of an ICFA claim, plaintiffs must show "that the allegedly deceptive act 'proximately caused any damages' suffered by the plaintiff." *Id.* (quoting *De Bouse*, 922 N.E.2d at 313); *see also Clark v. Experian Info. Solutions, Inc.*, 256 F. App'x 818, 821 (7th Cir. 2007) ("We concluded that 'a private cause of action under the ICFA requires a showing of proximate causation.'" (quoting *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 514–15 (7th Cir. 2006))). As part of proving proximate causation, a plaintiff must "receive, directly or indirectly, communication or advertising from the defendant." *De Bouse*, 922 N.E.2d at 316.

It is true that courts have denied class certification of ICFA claims on the grounds that individual issues of proving proximate causation predominate over common issues. *See, e.g.*, *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935–36 (7th Cir. 2010) (holding that individualized inquiries regarding "why a particular plaintiff purchased a particular brand of [the product]" were necessary to establish harm to each class member under the ICFA and, thus, common issues could not predominate); *In re Glaceau Vitaminwater Mktg. & Sales Practice Litig.*, No. 11-CV-00925 DLI RML, 2013 WL 3490349, at *8 (E.D.N.Y. July 10, 2013) (citing other cases); *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2005) ("To establish proximate causation, each individual must provide evidence of his or her knowledge of the deceptive acts

and purported misstatements. This showing requires an individual analysis of the extent to which Coca-Cola's marketing played a role in each class member's decision to purchase fountain diet Coke." (citations omitted)).

As Plaintiffs note, ICFA claims do not *necessarily* require individualized proof of causation such that class certification is never proper. Appellee Br. at 40 n.5. Rather, "where the representation being challenged was made to all putative class members, Illinois courts have concluded that causation is susceptible of classwide proof and that individualized inquiries concerning causation do not predominate if plaintiffs are able to adduce sufficient evidence that the representation was material." *In re ConAgra Foods*, 2015 WL 1062756, at *46 (and citing cases); *see also In re Glaceau Vitaminwater Mktg. & Sales Practice Litig.*, 2013 WL 3490349, at *9 ("Illinois courts have certified classes asserting violations of the ICFA, where the defendant engaged in 'uniform' conduct toward the class, and the successful adjudication of the named plaintiff's claims would establish a right to recovery for all class members."); *S37 Mgmt., Inc. v. Advance Refrigeration Co.,* 961 N.E.2d 6, 16 (Ill. App. Ct. 2011) ("The defendant argues that individual issues regarding deception and damages preclude class certification in this case. However, just as we found in *P.J.'s Concrete,* where a defendant is alleged to have acted wrongfully in the same manner toward the entire class, the trial court may properly find common questions of law or fact that predominate over questions affecting only individual members.").

### c. Florida

Burns seeks "certification of claims arising under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq.* ('FDUTPA')". Sealed App. at 20. "A claim under FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009). The Florida Supreme Court has not addressed whether reliance and/or causation requires individualized proof. Like Illinois, Florida courts of appeals and federal courts interpreting Florida law have reached somewhat diverging conclusions. *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 4742, 2012 WL 1015806, at *7–9 (N.D. Ill. Mar. 22, 2012) (noting this tension in the case law applying the FDUTPA).

Many courts have held that the FDUTPA does not require proof of actual, individualized reliance; rather, it requires only a showing that the practice was likely to deceive a reasonable consumer. *In re ConAgra Foods*, 2015 WL 1062756, at *42 ("Claims under the FDUTPA are governed by a 'reasonable consumer' standard, obviating the need for proof of individual reliance by putative class members."); *Office of the Att'y Gen. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004) ("When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances. . . . [U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."); *Davis v. Powertel, Inc.,* 776 So. 2d 971, 973–74 (Fla. Dist. Ct. App. 2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue. . . . [T]he question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances."); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. Dist. Ct. App. 2000) ("[M]embers of a class proceeding under the [FDUTPA] need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations." (internal quotation marks omitted)). In *Fitzpatrick*, 635 F.3d at 1283, the Eleventh Circuit affirmed the "legal analysis of the district court," which included the district court's conclusion that the FDUTPA's "causation requirement is resolved based on how an objective reasonable person would behave under the circumstances." *Fitzpatrick*, 263 F.R.D. at 695.

If the defendants did not make a generally uniform material misrepresentation to the entire class, other courts have held that plaintiffs do need to show individualized causation. The sole case cited by P&G, Appellant Br. at 39 n.6, falls into this camp. *Miami Auto. Retail, Inc. v. Baldwin*, 97 So. 3d 846, 857 (Fla. Dist. Ct. App. 2012) ("FDUTPA requires proof of each individual plaintiff's actual (not consequential) damage and defendant's causation of damage."). However, *Miami Automotive Retail* did not involve a "uniform representation," a circumstance in which the court noted "individual reliance may not be necessary under FDUTPA." *Id.* The district court in *In re Sears, Roebuck & Co. Tools Marketing & Sales Practices Litigation*

similarly distinguished this latter group of cases requiring proof of individual causation on the grounds that, unlike in the *Latman* and *Davis* line of cases, these cases did not involve one product advertised by a generally uniform theme to all consumers.  2012 WL 1015806, at *10.

### d.  New Hampshire

Jarzembrowski seeks "certification of claims arising under the New Hampshire Consumer Protection Act, N.H.R.S.A. 358-A *et seq.* (the 'New Hampshire CPA')."  Sealed App. at 20.  Very few New Hampshire cases are on point, but the limited case law indicates that proof of individual reliance or causation is not required under the New Hampshire CPA.

> In *Mulligan v. Choice Mortgage Corp. USA*, a federal district court explained that:
>
> New Hampshire courts use an objective standard to determine whether acts or practices are unfair or deceptive in violation of the CPA.  In order to come within the CPA, [t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.  For such conduct to be actionable, the plaintiff need not show that he or she actually relied on the deceptive acts or practices . . . .  Rather, a CPA plaintiff need only establish a causal link between the conduct at issue and his or her injury.

No. CIV. 96-596-B, 1998 WL 544431, at *11 (D.N.H. Aug. 11, 1998) (internal quotation marks and citations omitted); *see also Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676 ADS WDW, 2012 WL 764199, at *20 (E.D.N.Y. Mar. 5, 2012) ("[T]he New Hampshire statute also does not include the elements of reliance or scienter.").  The *Mulligan* court described the "causal link" as requiring that a plaintiff "show[] only that their injuries . . . [were] a consequence of [the defendant's] allegedly unfair and deceptive practices."  1998 WL 544431, at *12.

Greater clarity on the proof necessary to establish causation can be found in decisions from Massachusetts courts interpreting its analogous consumer fraud statute, to which "the New Hampshire Supreme Court frequently looks for guidance."  *Id.* at *11 n.7.  The Massachusetts Court of Appeals has held that causation under its consumer fraud statute "is established if the deception could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted," and "can also be established by determining whether the nondisclosure [or misrepresentation] was of a material fact" because "[m]ateriality . . . is in a

sense a proxy for causation." *Casavant v. Norwegian Cruise Line, Ltd.*, 919 N.E.2d 165, 169 (Mass Ct. App. 2009), *aff'd*, 952 N.E.2d 908 (2011) (first alteration in original). Materiality is an objective inquiry. *See id.* The sole case cited by P&G, Appellant Br. at 39 n.6, does not contradict this case law, because that case interpreted a different statute regarding unfair, deceptive, or unreasonable collection practices. *Gilroy v. Ameriquest Mortgage Co.*, 632 F. Supp. 2d 132, 137–38 (D.N.H. 2009).

### e. North Carolina

Finally, Burns also seeks certification of claims arising under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1 *et seq.* ("UDTPA"). Sealed App. at 20. "To state a claim under the UDTPA, a claimant must allege (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused injury to the plaintiff or his business." *Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc.*, 989 F. Supp. 2d 471, 477 (E.D.N.C. 2013). The North Carolina Supreme Court recently clarified that "a claim under section 75–1.1 stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *Bumpers v. Cmty. Bank of N. Virginia*, 747 S.E.2d 220, 226 (N.C. 2013). "Actual reliance is demonstrated by evidence [that the] plaintiff acted or refrained from acting in a certain manner due to [the] defendant's representations." *Williams v. United Cmty. Bank*, 724 S.E.2d 543, 549 (N.C. Ct. App. 2012) (internal quotation marks omitted). Plaintiffs base their claim under the UDTPA on misrepresentations by P&G regarding Align's efficacy. R. 85 (Second Amended Compl. ¶ 113) (Page ID #985). Thus, they must show actual reliance.

The issue, therefore, is whether North Carolina recognizes any circumstances under which classwide proof might suffice to show reliance. In *Bumpers*, which did not involve the issue of class certification, the North Carolina Supreme Court did describe the evidence necessary to prove reliance as focused on the mental state of the plaintiff and his/her decision-making process, which would seem to be difficult to prove on a classwide basis. *Bumpers*, 747 S.E.2d at 227 ("In making this inquiry we examine the mental state of the plaintiff. . . . In the context of a misrepresentation claim brought under section 75–1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation into his or her

decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether."). No North Carolina decision applying a presumption of reliance in class actions like that in California under the CLRA could be identified. The one case cited by Plaintiffs doing so, *In re Milo's Dog Treats Consolidated Cases*, is a federal district court decision and gave no explanation or support for its conclusion that its discussion of reliance under California law "is equally applicable to North Carolina's UDTPA." 9 F. Supp. 3d 523, 544 (W.D. Pa. 2014).

However, the North Carolina Supreme Court has held that reliance can be proved circumstantially, not just from direct testimony from the plaintiff. *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 428 S.E.2d 648, 661 (N.C. 1992) ("This Court has recognized that proof of circumstances from which the jury may reasonably infer the fact is sufficient in proving the element of reliance." (internal quotation marks omitted)). Moreover, the North Carolina Court of Appeals has held that a trial court erred in holding that a class action bringing a claim of fraud can *never* be certified because "establishing the elements of fraud requires Plaintiff to make individual showings of facts on the element of reliance." *Pitts v. Am. Sec. Ins. Co.*, 550 S.E.2d 179, 189 (N.C. Ct. App. 2001) (internal quotation marks omitted), *aff'd*, 356 N.C. 292 (2002). As the court explained, "although individualized showings may be required in actions for fraud, this does not in and of itself preclude a finding of the existence of a class" so long as common issues predominate. *Id.* at 190. The court added that "the benefit of allowing consumer fraud actions to proceed as class actions must be considered when determining whether the element of reliance, an individual issue, renders a class non-existent." *Id.* at 189. The court then held that common issues predominated. *Id.* at 190. While its reasoning is sparse, the court appeared to focus on the general uniformity in the defendant's conduct towards the class, but did not spell out whether or how it was finding a classwide presumption of reliance or inferring reliance based on the identical circumstances faced by the class members. *Id.*

### f. Summary of State Laws

As this survey of the relevant state laws demonstrates, Plaintiffs can prove causation and/or reliance on a classwide basis provided that (1) the alleged misrepresentation that Align promotes digestive health is material or likely to deceive a reasonable consumer, and (2) P&G

made that misrepresentation in a generally uniform way to the entire class. As previously discussed, both factors are met here. The first factor is met—there is only one reason to buy Align, to promote digestive health, and thus the alleged misrepresentation would be material to or likely to deceive a reasonable consumer. As to the second factor, P&G undertook a comprehensive marketing strategy with a generally uniform core message such that all class members were likely exposed to the alleged misrepresentation. At a minimum, all class members saw P&G's advertising on Align's packaging.

Although a somewhat closer call, we believe that this classwide proof—that the alleged misrepresentation is material and was made in a generally uniform manner to all class members—would also suffice in North Carolina to show actual reliance such that individual issues would not predominate. The Eleventh Circuit's discussion in *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), is instructive on how classwide circumstantial evidence in this case likely satisfies the individual reliance requirement under the UDTPA (although the case admittedly did not involve the UDTPA). Physicians brought a class action alleging that various HMOs had defrauded them, in part based on misrepresentations that the HMOs would reimburse them for medically necessary services plaintiffs provided to the HMOs' insureds. *Id.* at 1259. The court explained that "while each plaintiff must prove his own reliance in this case, we believe that, based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class. That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." *Id.* The court noted that the defendant made a uniform representation to class members. *Id.* And the court explained, "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due" because the promise to reimburse was a central reason physicians would sign the agreements. *Id.* Similarly, in this case the alleged misrepresentation that Align promotes digestive health is *the* reason to buy Align. Thus, a jury could "legitimate[ly] infer[] [reliance classwide] based on the nature of the alleged misrepresentations at issue." *Id.*

**3. Whether Align Actually Works**

Echoing its commonality argument, P&G claims that it has put forth unrebutted evidence that Align actually works—that it provides digestive health benefits for at least some of its consumers—and thus Plaintiffs will not be able to prove injury on a classwide basis. Appellant Br. at 33–37. The dissent also focuses on this argument. Even if P&G had not produced such proof, P&G argues that scientific evidence might establish that Align "provides benefits for some purchasers, but not all—the exact middle ground Plaintiffs ignore," and thus it would still be necessary to determine whether Align works for each individual class member to prove injury, such that common issues do not predominate. Appellant Reply Br. at 7. P&G cites several cases in which it claims that courts required class plaintiffs to provide some evidence of actual classwide injury to establish predominance at the class certification stage. Appellant Br. at 34–36.

As an initial matter and as already discussed, Plaintiffs contest whether the studies produced by P&G actually demonstrate that Align works for some individuals. Contrary to what the dissent claims, Plaintiffs have not tacitly conceded that Align works for individuals with IBS. Plaintiffs point to methodological flaws and problems with the studies on the effectiveness of Align for individuals with IBS to question the scientific validity of the studies in their own right, *in addition to* questioning whether those studies can be used to claim Align works for healthy individuals. *See, e.g.*, R. 9 (Amended Compl. ¶¶ 36–37) (Page ID #73–74) (for example, noting that in one study of women with IBS cited by P&G on its website, "the study tested *Bifidobacterium infantis 3562*4 at amounts (referred to as 'colony-forming units' or 'CFUs') different than what is present in Align® probiotic supplement" and "[t]he study authors expressly emphasized the variability of results depending on the amount of CFUs"). Although P&G and the dissent claim that Plaintiffs' own expert appeared to concede, in his deposition, that Align might have worked for one of his patients having digestive health issues, Dr. Komanduri stated later in the deposition that he did not know whether Align was helpful for his patient because it actually worked or because of a placebo effect. *See* R. 133 (Dep. of Srinadh Komanduri at 29–30, 58) (Page ID #5748, 5755).

More fundamentally, however, P&G's and the dissent's argument attacks a theory of liability that Plaintiffs have not actually presented—that Align is not effective unless it works for 100% of consumers who take it.  Appellant Br. at 32.  However, what Plaintiffs actually argue is that it has not been shown that Align works for *anyone*, i.e., that Align is "snake oil."  Appellee Br. at 7.  Thus, under Plaintiffs' theory of liability, P&G's claim that Align works for some individuals goes solely to the merits; it has no relevance to the class certification issue.  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 408 ("Under plaintiffs' first theory of liability, *nobody* was able to grow grass using EZ Seed.  Plaintiffs will succeed or fail on this theory based on whether they are able to prove EZ Seed is worthless.  Defendants' argument that the products worked for some individual class members goes to the proof of the merits of plaintiffs' claims.  Any argument that challenges the merits of plaintiffs' allegations about the uniform inefficacy of [EZ Seed] has no bearing on the Rule 23 predominance inquiry." (internal quotation marks and citation omitted)); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 594 (C.D. Cal. 2011) ("Defendant's arguments that it can present proof that Coldcalm worked for some individual class members goes to the proof of the merits of Plaintiff's claim, not to the common question as to the overall efficacy of the product."); *Fitzpatrick*, 263 F.R.D. at 701 (holding that "General Mills' other objection, that Yo–Plus might have worked for some consumers, does not preclude a finding of predominance; that question is largely encompassed by the predominant—and, according to Plaintiff, binary—issue of whether science supports General Mills' claim that Yo–Plus aids in the promotion of digestive health").  We have an obligation to assess the theory of liability Plaintiffs present to us, rather than dismiss it as mere artful pleading, and Plaintiffs' theory of liability—that Align is entirely ineffective—is hardly unprecedented in the consumer fraud context as these cases demonstrate.

Plaintiffs have presented sufficient evidence in the form of testimony from Dr. Komanduri that their theory of liability—that Align is worthless—is capable of resolution through classwide scientific proof such that common issues predominate.  R. 108-8 (Komanduri Decl. at 2–4) (Page ID #1596–98).  Specifically, Dr. Komanduri attested that whether Align works for *anyone* can be tested by "correctly designed randomized, double-blind and placebo controlled clinical trials testing relevant outcomes."  *Id.* ¶ 15 (Page ID #1597).  The studies that P&G's own expert cites and the dissent highlights as allegedly demonstrating that Align in fact

has been proven to work for some individuals (such as those with IBS) are of a similar kind. R. 115 (Merenstein Decl. at 12–16) (Page ID #4302–06). At the merits stage, Plaintiffs will have the opportunity to put forth their own scientific evidence on Align's efficacy and to present expert testimony more fully contesting the accuracy of these studies and others P&G may produce. The key point at the class-certification stage is that this kind of dueling scientific evidence will apply classwide such that individual issues will not predominate. In other words, assessing this evidence will generate a common answer for the class based on Plaintiffs' theory of liability—whether Align in fact has been proven scientifically to provide digestive health benefits for anyone. That common answer, of course, may be that Align does work for some subsets of the class. That does not transform this classwide evidence into individualized evidence that precludes class certification, however. Neither P&G nor the dissent has articulated how evidence that Align might work for some sub-populations actually would necessitate individualized mini-trials that should preclude class certification. Rather, the more straightforward impact of this evidence is simply that it may prevent Plaintiffs from succeeding on the merits.

The possibility that, at a later point in the litigation, the district court may choose to revisit the issue of class certification rather than dismiss the case if assessment of the fully developed evidence presented by both parties suggests Align actually works for some sub-populations is hardly as unprecedented or problematic as the dissent suggests. "Federal Rule of Civil Procedure 23 provides district courts with broad discretion to determine whether a class should be certified, *and to revisit that certification throughout the legal proceedings before the court.*" *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001) (emphasis added), *abrogation on other grounds recognized in Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014). If later evidence disproves Plaintiffs' contentions that common issues predominate, "the district court may consider at that point whether to modify or decertify the class." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."). This possibility, however, is not a reason to deny class certification now when Plaintiffs have demonstrated that their current theory of liability will be proved or disproved through scientific evidence that applies classwide.

Moreover, the cases P&G cites do not hold that establishing predominance means that named plaintiffs must produce actual proof at the class-certification stage of classwide injury, here that Align is "snake oil." On predominance specifically, we emphasized in *In re Whirlpool* that "the [*Amgen*] Court repeatedly emphasized that the predominance inquiry must focus on common questions that *can be proved* through evidence common to the class." *In re Whirlpool*, 722 F.3d at 858 (emphasis added). In other words, named plaintiffs must show that *they will be able* to prove injury through common evidence, not that they have in fact proved that common injury. Or, as the *Amgen* Court expanded, "While Connecticut Retirement certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification. Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 133 S. Ct. at 1191. Here, "an inability of the plaintiff class 'to prove [that Align does not work for anyone] would not result in individual questions predominating. Instead, a failure of proof on th[is] issue . . . would end the case.'" *In re Whirlpool*, 722 F.3d at 858 (quoting *Amgen*, 133 S. Ct. at 1191). *See also id.* at 860 ("To the extent that *Comcast Corp.* reaffirms the settled rule that liability issues relating to injury *must be susceptible of proof* on a classwide basis to meet the predominance standard, . . . that requirement is met in this case." (emphasis added)).

The two cases cited by P&G are better characterized as holding that the plaintiffs had not demonstrated that the alleged injuries were *capable* of resolution by classwide proof that would predominate over individual issues. *Pilgrim v. Universal Health Card, LLC* involved a class action claiming health care programs were falsely advertised as providing "consumers access to a network of healthcare providers that had agreed to lower their prices for members." 660 F.3d 943, 945 (6th Cir. 2011). We affirmed the district court's denial of class certification in part on the basis of lack of predominance. *Id.* at 947–48. Although we noted that there was evidence that "the program apparently satisfied some consumers," *id.* at 948, our holding actually rested on the fact that the "program did not operate the same way in every State and the plaintiffs suffered distinct injuries as a result." *Id.* at 947–48. As previously discussed, this case involves one product with a uniform marketing scheme and message that either does not work for anyone or does work at least for some individuals.

Similarly, the decision in *Phillips v. Philip Morris Cos.*, 298 F.R.D. 355 (N.D. Ohio 2014), denying class certification in a false advertising challenge to Philip Morris's claim that light cigarettes had low tar hinged on the plaintiffs' inability to prove that a common injury *could be proved*. First, "there [was] no inherent design defect that rendered the product less valuable," and "[t]he potential to realize an injury from the product . . . depend[ed] upon the manner in which each consumer used the product and the unique characteristics of each consumer." *Id.* at 368. Second, the court noted that some consumers might have purchased the cigarettes for a reason unrelated to the alleged misrepresentation about lower tar and nicotine, such as flavor. *Id.* n.20. Here, however, there is only one reason to buy Align: its digestive health benefits. And whether or not Align works as promised for *anyone*—the issue here—is a scientific question that will not turn on the individual behavior of consumers; if Align is shown to work, even for only certain individuals, then presumably Plaintiffs lose.

In the other two cases cited by P&G, the courts denied class certification because there was a disconnect between the class's theory of liability and the class's damages model, not because the named plaintiffs had not conclusively proved injury to the entire class at the class-certification stage, as P&G claims. As discussed in the next subsection, there is no similar disconnect here.

In *In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869*, for example, the D.C. Circuit denied class certification because the damages model presented by the plaintiffs could not reliably prove classwide injury in fact, i.e., it would "detect[] injury where none could exist." 725 F.3d 244, 252–53 (D.C. Cir. 2013). It was in this context that the D.C. Circuit stated that it "do[es] expect the common evidence to show all class members suffered *some* injury." *Id.* at 252. However, the D.C. Circuit did not alter the normal rule that named plaintiffs need only show at the class-certification stage "that they *can prove*, through common evidence, that all class members were in fact injured by the alleged conspiracy," not that they have in fact proved that injury. *Id.* (emphasis added).

Similarly, in *Parko v. Shell Oil Co.*, the Seventh Circuit held that the district court abused its discretion in certifying a class because of a disconnect between the class's damages model and its liability theory. 739 F.3d 1083 (7th Cir. 2014). The class alleged nuisance and related

torts on the basis of alleged groundwater contamination occurring over a 90-year period. *Id.* at 1084. The court, in finding a lack of predominance, did note that the plaintiffs had presented nothing more than "unsubstantiated allegation." *Id.* at 1086. But the unsubstantiated allegation was not whether the groundwater was actually contaminated, as P&G claims, but the plaintiffs' claim that they "intend[ed] to rely on common evidence and a single methodology to prove both injury and damages" that was sound and plausible. *Id.* Thus, the Seventh Circuit reversed class certification because the district court had not "investigated the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments." *Id.* Specifically, the plaintiffs proposed to measure damages "by the effect of the groundwater contamination on the value of the class members' properties," but the defendants pointed out that the plaintiffs did not own the groundwater underneath their property and that their water supply did not come from that groundwater. *Id.* at 1084, 1086. Thus, it was not clear how contamination in the groundwater could affect property values. *Id.* at 1086. It was this disconnect between the plaintiffs' damages model and their liability theory that led the Seventh Circuit to deny class certification.[7]

Moreover, our holding today is consistent with the Supreme Court's recent decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014). In that case, the Supreme Court held that, at the class-certification stage, defendants in private securities fraud class actions must be able to present evidence rebutting a particular presumption of classwide reliance available in these kinds of cases. 134 S. Ct. at 2417. The *Halliburton* Court's holding is limited to allowing rebuttal evidence on issues that affect predominance, not evidence that affects only the merits of a case. *Id.* at 2416. Given Plaintiffs' theory of liability in this case, the evidence that P&G has presented fails this test—it affects only the merits of this case, not predominance. Even if the evidence P&G presented did affect predominance, however, it is not clear how P&G

---

[7]Further evidence that the plaintiffs' failure to prove that the groundwater was in fact contaminated was immaterial to the Seventh Circuit's decision is found in the case that the Seventh Circuit cites as properly granting class certification, *Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002). *Parko*, 739 F.3d at 1087. As described by the *Parko* court, in that case "the leakage of the noxious solvent *was claimed* to have contaminated the water supply, as noted by the district court." *Id.* (emphasis added). In other words, the plaintiffs had not actually proved that the water supply was contaminated for most class members at the class-certification stage; rather, they had articulated a coherent theory of injury and damages because they alleged that the contaminated water had entered the water supply, and therefore more clearly could affect property values.

alleges the district court violated *Halliburton* given that P&G was not prevented from putting forth this evidence.[8]

### 4.   Whether Plaintiffs' Damages Model Is Consistent With Their Liability Theory

Finally and relatedly, P&G claims that Plaintiffs have "failed to provide any viable method to determine or award classwide damages, as required by *Comcast Corp. v. Behrend*, 133 S. Ct. [1426,] 1433 [(2013)]," because P&G presented evidence that some class members benefited from Align, or the scientific evidence could establish Align works for some individuals.  Appellant Br. at 43–44.

The premise of this argument suffers from the same problems with P&G's preceding argument.  Plaintiffs are claiming that Align works for *no one*, and if they are correct, all class members suffered from the same injury, buying a product that does not work as advertised.  If Align in fact is proven scientifically to work for some individuals, Plaintiffs will lose on the merits.

Moreover, Plaintiffs' damages model—a full refund of the purchase price for each class member—satisfies *Comcast*.  In that case, the Supreme Court held that courts must conduct a "rigorous analysis" to ensure at the class-certification stage that "any model supporting a plaintiff's damages case [is] consistent with its liability case," i.e., that the model "measure[s] only those damages attributable to that theory" of liability.  *Comcast*, 133 S. Ct. at 1433 (internal quotation marks omitted).  That is the case here.  A full refund for each class member is appropriate because, as the district court explained, there is no reason to buy Align except for its purported digestive benefits—"[i]t is a capsule filled with bacteria and inert ingredients.  If, as alleged, the bacteria does nothing, then the capsule is worthless."  R. 140 (Dist. Ct. Order at 30)

---

[8]P&G also argues in its reply brief that Plaintiffs have at most presented evidence that P&G's claims about Align are unsubstantiated, but false advertising claims require affirmative proof of falsity, not just lack of substantiation.  Appellant Reply Br. at 16–19.  P&G argues that lack of substantiation claims are within the sole province of the Federal Trade Commission and other regulatory agencies.  *Id.* at 17.  P&G's argument goes to the merits of the case, not to whether class certification is proper.  Indeed, all of the cases cited by P&G involve discussions of the *merits* of false advertising claims and do not indicate that this distinction is at all relevant to whether a class should be certified.  Whether the standard is affirmative proof of falsity or lack of substantiation, the evidence necessary to prove this issue will be the same for the entire class such that individual issues will not predominate.

(Page ID #6444). Whether purchasers were nevertheless satisfied with Align does not affect the propriety of a full-refund damages model. *See, e.g.*, *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014) (holding that restitution is the appropriate damages model even for satisfied customers if the plaintiffs prove that "Defendants' products are placebos, and that the products' effectiveness arises solely as a result of the placebo effect") (internal quotation marks omitted). And this analysis is the same for all class members: "either 0% or 100% of the proposed class members were defrauded. There is no evidence that some proposed class members knew of the alleged falsity of Defendant's advertising yet purchased Align anyway." R. 140 (Dist. Ct. Op. at 31) (Page ID #6445). Thus, Plaintiffs' damages model measures only damages attributable to its theory of liability, i.e., that P&G is liable if it is not proven scientifically that Align helps *anyone*, and thus satisfies *Comcast*. *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 412 (holding that a "full compensatory damages model, under which consumers would receive a full refund for their purchases of EZ Seed[,] . . . matches plaintiffs' first theory of liability—that EZ Seed does not grow grass, and is thus valueless," and therefore "satisfies *Comcast* because it measures damages properly if EZ Seed is valueless" (internal quotation marks omitted)).

In sum, the district court did not abuse its discretion in determining that common issues will predominate over individual issues in resolving the key merits issue of this case—whether Align promotes digestive health for *anyone*.

**D. Standing**

P&G also contends that the class is overbroad and thus raises Article III standing issues because Plaintiffs have failed to produce evidence that most of the class suffered an injury, i.e., that Align did not work for them. Appellant Br. at 45–47. This argument again misconstrues the basic theory of liability at issue in this case. Under Plaintiffs' theory of liability, P&G falsely advertised to every purchaser of Align. As the district court put it, there is no reason to purchase Align except for its promised digestive health benefits. If Align does not work as advertised for

*anyone*, then every purchaser was harmed, and a direct line can be drawn from P&G's advertising campaign and the decision to buy Align.**9**

**E.  The Proposed Class is Sufficiently Ascertainable**

Finally, P&G contends that the proposed class is not ascertainable because "Plaintiffs have failed to demonstrate that there is a 'reliable' and 'administratively feasible' method for *identifying* the class members." Appellant Br. at 50.  Most consumers do not buy Align directly from P&G.  Instead, they purchase the product from a commercial retailer, either in stores or online.  This circumstance, P&G contends, makes ascertainability impossible—there is no plausible way to verify that any one single individual actually purchased Align.  In making this point, P&G relies on the Third Circuit's decision in *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013).

The district court did not abuse its discretion in holding that the class is sufficiently ascertainable.  In our circuit, the ascertainability inquiry is guided by *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532 (6th Cir. 2012).  And under *Young*, Plaintiffs have produced evidence sufficient to show that the class is ascertainable.  We see no reason to follow *Carrera*, particularly given the strong criticism it has attracted from other courts.  *See, e.g.*, *Mullins v. Direct Digital, LLC*, No. 15-1776, 2015 WL 4546159, at \*7 (7th Cir. July 28, 2015) (declining to follow *Carrera* because "[t]he Third Circuit's approach in *Carrera,* which is at this point the high-water mark of its developing ascertainability doctrine, goes much further than the established meaning of ascertainability and in our view misreads Rule 23"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 566 (C.D. Cal. 2014) (discussing *Carrera* and noting that "ConAgra's argument would effectively prohibit class actions involving low priced consumer goods—the very type of claims that would not be filed individually—thereby upending '[t]he policy at the very core of the class action mechanism'" (quoting *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 617 (1997))).  Even if *Carrera* governed, there are a number of factual differences that make a finding of ascertainability more appropriate here.

---

**9**P&G urges us to enter a circuit split over whether it is sufficient that the named class plaintiff has standing, regardless of whether unnamed class members do.  Appellant Br. at 48–50.  Because reaching this argument requires accepting P&G's inaccurate characterization of Plaintiffs' theory of liability in this case, we do not find it necessary to evaluate this claim.

In *Young*, the named plaintiffs sued their respective insurance companies, alleging "that their insurer charged them a local government tax on their premiums when either the tax was not owed or the tax amount owed was less than the insurer billed." 693 F.3d at 535. The district court certified a class of "[a]ll persons in the Commonwealth of Kentucky who purchased insurance from or underwritten by [Defendant insurer] . . . and who were charged local government taxes on their payment of premiums which were either not owed, or were at rates higher than permitted." *Id.* at 536 (second alteration in original). On appeal, the insurance companies argued "that the class definition [was] not administratively feasible" because the plaintiffs' class description was not "sufficiently definite so that it [would be] administratively feasible for the court to determine whether a particular individual is a member." *Id.* at 538.

We rejected this argument. We noted that "[f]or a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Id.* (internal quotation marks omitted). The plaintiffs had presented such a class, because class membership could be determined by reviewing factors such as "the location of the insured risk/property" and "the local tax charged and collected from the policyholder." *Id.* at 539. Unlike the Third Circuit in *Carrera*, we considered—and rejected—the defendants' claim "that the class properly could [not] be certified without . . . 100% accuracy." *Id.* Instead, we agreed with the district court's conclusion that "the subclasses can be discerned with reasonable accuracy using Defendants' electronic records and available geocoding software, though the process may require additional, *even substantial*, review of files." *Id.* (emphasis added) (internal quotation marks omitted). The court added that "[i]t is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies." *Id.* at 540.

This same reasoning applies to the instant case. The proposed class is defined by objective criteria: anyone who purchased Align in California, New Hampshire, Illinois, North Carolina, or Florida. As in *Young*, these single state sub-classes can be determined with reasonable—but not perfect—accuracy. Doing so would require substantial review, likely of

internal P&G data. But as the district court pointed out, such review could be supplemented through the use of receipts, affidavits, and a special master to review individual claims. R. 140 (Dist. Ct. Order at 13–15) (Page ID #6427–29).

Even if we were to apply *Carrera*, there are significant factual differences that make this class more ascertainable. In *Carrera*, the plaintiff brought a class action against Bayer Corporation, "claiming that Bayer falsely and deceptively advertised its product One–A–Day WeightSmart." 727 F.3d at 304. "Carrera allege[d] [that] Bayer falsely claimed that WeightSmart enhanced metabolism by its inclusion of epigallocatechin gallate, a green tea extract." *Id.* Carrera moved to certify a class consisting of "all persons who purchased WeightSmart in Florida," which the district court granted. *Id.* In vacating and remanding the district court's order, the Third Circuit held that Carrera's proposed class was not sufficiently ascertainable under the methods proposed by Carrera. *Id.* at 308–11.

First, Carrera proposed "using retailer's records of sales made with loyalty cards . . . , and records of online sales." *Id.* at 308. The Third Circuit rejected this approach. It noted that "there is no evidence that *a single purchaser* of WeightSmart could be identified using records of customer membership cards or records of online sales." *Id.* at 309 (emphasis added). Still, the court maintained that, "[d]epending on the facts of a case, retailer records may be a perfectly acceptable method of proving class membership." *Id.* at 308–09. Second, Carrerra proposed taking affidavits from various class members, the veracity of which could be assessed by a private firm tasked with administering class settlements. The Third Circuit likewise rejected this approach. It noted that this method "does not show [that] the affidavits will be reliable," thereby undercutting Bayer's due-process interests. *Id.* at 311.[10]

---

[10]It is worth noting that the Third Circuit subsequently has cautioned against a broad reading of *Carrera*. In *Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015), the court discussed the ascertainability requirement in detail. The Third Circuit noted that *Carrera* "only requires the plaintiff to show that class members *can be identified*." *Id.* at 164 (quoting *Carrera*, 727 F.3d at 308 n.2). "*Carrera*," in other words, only "stands for the proposition that a party cannot merely provide assurances to the district court that it will later meet Rule 23's requirements." *Id.* In *Byrd*, the Third Circuit went on to characterize the defendants' "reliance on *Carrera*" as "misplaced." *Id.* at 170. "In *Carrera*, we concluded that the plaintiffs' proposed reliance on affidavits alone, *without any objective records to identify class members or a method to weed out unreliable affidavits*, could not satisfy the ascertainability requirement." *Id.* (emphasis added). On the other hand, the Byrds—like Plaintiffs in this case—"presented the District Court with multiple definitions of class members and simply argued that a form similar to those provided could be used to identify household members." *Id.*; *see also id.* ("There will always be some level of inquiry required to verify that a person is a member of a class."). To emphasize the point, the Third Circuit stated that,

Here, in contrast, there is "evidence that *a single purchaser* [in the proposed class] . . . could be identified using records of customer membership cards or records of online sales." *Id.* at 309 (emphasis added). P&G's own documents indicate that more than half of its sales are online. Sealed App. at 514. At a minimum, online sales would provide the names and shipping addresses of those who purchased Align. In addition, studies conducted by P&G reveal that an overwhelming number of customers learned about Align through their physicians. *See* Sealed App. at 160–61 (documenting surveys showing 39% to 80% of all users hearing about Align through a physician). Unlike the proposed class in *Carrera*, P&G could verify that a customer purchased Align by, for instance, requesting a signed statement from that customer's physician. Store receipts and affidavits can supplement these methods.

In sum, the district court did not abuse its discretion in finding the proposed class to be sufficiently ascertainable. As the district court pointed out, there is significant evidence that Plaintiffs could use traditional models and methods to identify class members. *See* R. 140 (Dist. Ct. Op. at 12–15) (Page ID #6426–29). These methods satisfy *Young*.

## III CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment granting class certification.

---

"[c]ertainly, *Carrera* does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken. If that were the case, no Rule 23(b)(3) class could ever be certified." *Id.* at 171.

_____

**CONCURRENCE**

_____

AVERN COHN, District Judge, concurring.  I concur in the lead opinion and have this to add.  As I read Plaintiffs' false-advertising claims, they are predicated on the proposition that Align has no digestive health benefits to *anyone*, and that there is no reason to purchase Align other than for its promised digestive health benefits.  On return to the district court, given the disagreements between the lead opinion and dissent, I believe the district judge, before proceeding further, should consider bifurcation under Fed R. Civ. P. 42(b) the issue of the digestive health benefits of Align.  If, as Plaintiffs claim, there is no scientific evidence that Align promotes digestive heath for *anyone*, the case can proceed in the regular course.  If, on the other hand, Plaintiffs' proofs fail to establish that Align has no digestive health benefits, the case should be dismissed.  *See, e.g.*, *Gillie v. Law Office of Eric A. Jones, LLC*, No. 2:13-CV-212, 2013 WL 6255693 (S.D. Ohio Dec. 4, 2013) (to conserve judicial resources, bifurcating under Rule 42(b) issues relating to liability, such as whether defendants are considered "debt collectors" under the Fair Debt Collection Practices Act), *granting defendants' motion for summary judgment on liability*, 37 F. Supp. 3d 928 (S.D. Ohio 2014), *vacated and remanded*, 785 F.3d 1091 (6th Cir. 2015); *see generally* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution*, 36 Sw. L.J. 743, 744 (1982) (discussing the economic benefits of bifurcation in class actions).

---

**DISSENT**

---

COOK, Circuit Judge, dissenting.  Recent Supreme Court precedent clearly holds that "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014); *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  District courts may certify a class only where the plaintiff presents "evidentiary proof" sufficient to withstand "rigorous analysis" of Rule 23's requirements. *Comcast*, 133 S. Ct. at 1432.  Nothing about the district court's analysis here was rigorous, and the majority papers over this abuse of discretion by claiming that any further inquiry would result in an impermissible "dress rehearsal" for trial. More often than not, however, a district court's "'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551–52 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 614 (1982)).  And this case is no exception to that rule. Because the majority opinion conflicts with the Supreme Court's Rule 23 jurisprudence, I dissent.

Plaintiffs proclaim that Align is "snake oil" that produces nothing more than a placebo effect.  But Plaintiffs offer no proof in support of this argument, and all the available evidence tends to show the opposite:  that consumers benefit more or less from Align based on their individual gastrointestinal health.  P&G's scientific studies and anecdotal evidence tend to show, at the very least, that patients suffering from irritable bowel syndrome (IBS) benefit from Align. Plaintiffs tacitly acknowledge as much in their amended complaint, challenging the design of these studies and arguing that P&G relies on an impermissible string of inferences to conclude that Align also benefits "healthy" people.

Plaintiffs' attempt to distinguish Align's impact on IBS sufferers from its effect on the general population exposes the flaw in their proposed class definition.  At this stage, Plaintiffs must demonstrate that they can disprove Align's efficacy for every member of the class at one

time.  The class certified by the district court includes all consumers who purchased Align, IBS patients and "healthy" consumers alike.  Because the evidence tends to show that these two groups respond differently to Align, Plaintiffs have failed to meet their burden of showing that their theory of liability lends itself to common investigation and resolution.  *See Dukes*, 131 S. Ct. at 2551 (stating that the benchmark for commonality is a classwide proceeding's ability to generate common answers rather than counsel's ability to formulate common questions).

Furthermore, Plaintiffs offer no proof that the benefits associated with Align result solely from a placebo effect.  Their expert, Dr. Komanduri, expressed no opinion on the question and declined to confront any of P&G's studies directly.  He dismissed all these trials as too unscientific, although he has yet to study the product himself and acknowledges that the IBS symptoms of at least one of his patients improved after taking Align.  In lieu of an expert opinion, Dr. Komanduri promised to design and conduct a clinical trial that will prove definitively whether Align works as advertised, notwithstanding the experts who already conclude that it works for at least some consumers.  With nothing more than that promise, the district court certified a class of millions across five states.  In doing so, the court impermissibly shifted the burden to P&G, forcing it to disprove the commonality and predominance elements of Rule 23.

To avoid confronting these flaws, the majority quotes *Amgen*'s admonition that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  133 S. Ct. at 1195.  But whether Align works similarly for each class member is relevant to certification and therefore not beyond the scope of the court's rigorous analysis.  *See Dukes*, 131 S. Ct. at 2551–52 ("The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (quoting *Falcon*, 457 U.S. at 160)).  If Align works to varying degrees—or at all—depending on each member's unique physiology, then the question of Align's efficacy involves myriad individual inquiries.  *See Comcast*, 133 S. Ct. at 1432 ("The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).").  This fundamental defect will not disappear by allowing Plaintiffs to define the question at an impossibly high level of abstraction.  As the case proceeds, the problems with the

district court's certification order will become painfully clear.   Either the court will have to whittle down the class definition every time P&G produces a study showing that patients with a certain makeup benefit from Align or the court must award judgment to P&G and preclude class members with colorable claims from recovery because it defined the class too broadly in the first place.

By discounting the evidence presented at the certification stage, moreover, the majority affirms a class definition that includes a clutch of members without standing.  *E.g.*, *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant . . . ." (citations omitted)); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must therefore be defined in such a way that anyone within it would have standing.").  The class definition includes all purchasers of Align despite the fact that Plaintiffs offer no proof to rebut the studies showing that the product improves digestive health for IBS patients.  The only evidence before the court shows that IBS patients suffered no injury (because Align works as-advertised for them), and therefore Plaintiffs have failed to show a properly defined class.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").  Unless Plaintiffs muster some evidence rebutting the IBS studies, their claim is already doomed.

For these reasons, the Supreme Court requires plaintiffs to affirmatively prove that common questions both exist and predominate.  Though Plaintiffs artfully frame the question in a binary fashion, a rigorous analysis of their evidence shows that resolution of the Plaintiffs' question cannot apply universally to all class members.  Plaintiffs offer nothing in support of their claim that Align benefits no one.  Instead, they nitpick P&G's competent evidence, trot out an expert without any opinion as to the supplement's efficacy, and promise to conduct the definitive trial of Align that accounts for all variables of human physiology.  *Dukes* and its progeny teach us that this is insufficient to justify class certification.  I must dissent.