RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SANDUSKY WELLNESS CENTER, LLC, an Ohio limited liability company, individually and as the representative of a class of similarly situated persons,

*Plaintiff-Appellant*,

*v.*

ASD SPECIALTY HEALTHCARE, INC., D/B/A BESSE MEDICAL AMERISOURCEBERGEN SPECIALTY GROUP, INC.; JOHN DOES 1–10,

*Defendants-Appellees*.

No. 16-3741

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:13-cv-02085—Jack Zouhary, District Judge.

Argued: February 2, 2017

Decided and Filed: July 11, 2017

Before: SUHRHEINRICH, SUTTON, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Glenn L. Hara, ANDERSON + WANCA, Rolling Meadows, Illinois, for Appellant. Martin W. Jaszczuk, JASZCZUK P.C., Chicago, Illinois, for Appellees. **ON BRIEF:** Glenn L. Hara, ANDERSON + WANCA, Rolling Meadows, Illinois, Matthew E. Stubbs, MONTGOMERY RENNIE & JONSON, Cincinnati, Ohio, for Appellant. Martin W. Jaszczuk, W. Scott Hastings, Keith L. Gibson, LOCKE LORD LLP, Chicago, Illinois, Jennifer J. Dawson, MARSHALL & MELHORN, LLC, Toledo, Ohio, for Appellees.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.  In 2010, Defendant ASD Specialty Healthcare, d/b/a/ Besse Medical AmerisourceBergen Specialty Group ("Besse"), a pharmaceutical distributor, sent a one-page fax advertising the drug Prolia to 53,502 physicians.  Only 40,343, or 75%, of these faxes were successfully transmitted.  Plaintiff Sandusky Wellness Center, a chiropractic clinic that employed one of these physicians, claims to have received this so-called "junk fax," and—three years later—filed a lawsuit against Besse for the annoyance.  Sandusky alleged that Besse violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, by sending an unsolicited fax advertisement lacking a proper opt-out notice, and it sought to certify a putative class of all 40,343 Prolia fax recipients.  The district court denied Sandusky's motion for class certification, and because that decision was not an abuse of discretion, we affirm.

**I**

We first provide a brief overview of the Telephone Consumer Protection Act before turning to the facts of this case.

**A**

In 1991, Congress passed the Telephone Consumer Protection Act (TCPA), *see* Pub. L. No. 102-243, 105 Stat. 2394, which was later amended by the Junk Fax Prevention Act of 2005, *see* Pub. L. No. 109-21, 119 Stat. 359 (codified at 47 U.S.C. § 227).  These legislative efforts were geared towards curbing the inundation of "junk faxes" that businesses were receiving.  H.R. Rep. 102–317 at 10 (1991).  These faxes were seen as problematic because they forced unwitting recipients to bear the costs of the paper and ink and also monopolized the fax line, preventing businesses from receiving legitimate messages.  *Id.*

In response, the TCPA generally banned the sending of any "*unsolicited* advertisement" via fax.  47 U.S.C. §227(b)(1)(C) (emphasis added).  A fax is "unsolicited" if it is sent to persons who have not given their "prior express invitation or permission" to receive it.  *Id.* § 227(a)(5).

The statute carves out a narrow exception to this general ban by permitting the sending of unsolicited faxes if a sender can show three things: (1) the sender and recipient have "an established business relationship"; (2) the recipient voluntarily made his fax number available either to the sender directly or via "a directory, advertisement, or site on the Internet"; and (3) the fax contained an opt-out notice meeting detailed statutory requirements. *Id.* § 227(b)(1)(C)(i)-(iii). The upshot of this exception is that if an unsolicited fax does not contain a properly worded opt-out notice, the sender will be liable under the statute, regardless of whether the other two criteria are met.

Congress also authorized the Federal Communications Commission (FCC) to "prescribe regulations to implement the requirements of [the TCPA]." *Id.* § 227(b)(2). In 2006, the FCC promulgated a rule requiring opt-out notices on *solicited* faxes, i.e., those faxes sent to recipients who had given their "prior express invitation or permission" to receive it. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25,967, 25,971–72 (May 3, 2006) (now codified at 47 C.F.R. § 64.1200(a)(4)(iv)) (the "Solicited Fax Rule"). After the passage of the Solicited Fax Rule, both unsolicited and solicited faxes were required to include opt-out notices that, among other things, were "clear and conspicuous," informed recipients that a sender was required to comply with an opt-out request "within the shortest reasonable time," and included a telephone number recipients could call to exercise their opt-out rights. *See* 47 U.S.C. § 227(b)(2)(D)(i)-(vi).

To ensure fax senders complied with the TCPA, Congress provided for a private right of action that allowed individuals and entities to sue for injunctive and monetary relief based on any violation "of [the statute] or the regulations prescribed [there]under." *Id.* § 227(b)(3). Specifically, fax senders faced a $500 fine for each fax sent that violated the TCPA or any FCC rule—a fine that could be increased to $1,500 per fax for willful violations. *Id.*

The import of the TCPA's damage scheme combined with the FCC's Solicited Fax Rule meant vast exposure to liability for businesses that used fax machines to advertise. For example, even individuals who agreed to receive faxes could nevertheless turn around and sue senders for $500 per fax if, in their view, an opt-out notice was not sufficiently "clear and conspicuous."

For businesses that sent faxes on a mass scale, this liability quickly added up. *See, e.g., Nack v. Walburg*, 715 F.3d 680, 682 (8th Cir. 2013) (recognizing that the Solicited Fax Rule's opt-out notice requirement subjected Walburg to "a class-action complaint seeking millions of dollars even though there is no allegation that he sent a fax to any recipient without the recipient's prior express consent"). Here, for example, Sandusky proposed a class size of 40,343 individuals and entities. With a minimum of $500 potentially owed to each class member, Besse could be on the hook for over $20 million.

Concerned by this specter of crushing liability, businesses (and courts) began to question whether the FCC possessed the authority to promulgate the Solicited Fax Rule given that the text of the TCPA appeared to reach only unsolicited faxes. *See, e.g., id.* (finding it "questionable whether the regulation at issue . . . properly could have been promulgated under the statutory section that authorized a private cause of action"). Many fax senders petitioned the FCC for a declaratory ruling asking the agency to acknowledge its lack of statutory authority, *see* Anda Petition for Declaratory Ruling, CG Docket No. 05-338 (Nov. 30, 2010).

But in 2014, the FCC issued an order denying the petitioners' request, standing by the Solicited Fax Rule. *See* Order, *Petitions for Declaratory Ruling, Waiver, and/or Rulemaking Regarding the Commission's Opt-Out Requirements for Faxes Sent with the Recipient's Prior Express Permission*, 29 F.C.C.R. 13,998, 13,998, 14,005 (2014) ("2014 Order"). In the same order, the FCC granted retroactive waivers of liability to the petitioners, exempting them from compliance with the Rule during a certain timeframe due to confusion over its applicability. *Id.* at 13,998. Furthermore, the FCC encouraged other fax senders to "seek waivers such as those granted in this [2014] Order." *Id.* Besse heeded this advice, and in August 2015, the FCC granted it, along with 100 others, a similar liability waiver. Order, *Petitions for Declaratory Ruling and Retroactive Waiver of 47 C.F.R. § 64.1200(a)(4)(iv) Regarding the Commission's Opt-Out Requirements for Faxes Sent with the Recipient's Prior Express Permission*, 30 F.C.C.R. 8598 (2015) ("2015 Order").

After the 2014 Order was issued, several fax senders filed petitions for review of the agency's decision in multiple circuit courts. *Bais Yaakov* Docket, Notice of Multi-Circuit Petitions for Review filed on 11/13/14; Attachment A. The United States Judicial Panel on

Multidistrict Litigation consolidated the petitions in the District of Columbia Circuit. *Bais Yaakov* Docket, Consolidation Order filed on 11/14/14.  In March 2017, a split panel of the D.C. Circuit struck down the Solicited Fax Rule, holding it "unlawful to the extent that it requires opt-out notices on solicited faxes." *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017).  Applying the *Chevron* framework, the majority found that the clear text of the TCPA reached only *unsolicited* fax advertisements and that the FCC was thus without the authority to promulgate a rule governing *solicited* faxes.  *See id.* at 1082 (citing *Chevron USA Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 & n.9 (1984)) ("Congress drew a line in the text of the statute between unsolicited fax advertisements and solicited fax advertisements.").  Because the majority struck down the Solicited Fax Rule, the question of the FCC's authority to issue retroactive waivers—which was also challenged—became moot.  *Id.* at 1083 n.2.  The D.C. Circuit's invalidation of the Solicited Fax Rule occurred after the district court denied Sandusky's motion for class certification in this case.

**B**

Besse is a distributor of pharmaceuticals and medical products.  In 2007, it purchased a list of physician contact information from InfoUSA, a third-party data provider.  Some of the physicians on that list, Besse later learned, happened to be current or former customers.  Besse condensed the InfoUSA List down to 53,502 names, creating the Prolia List, which it planned to use to send a fax advertising the drug.  On June 16, 2010, WestFax, a fax broadcaster, transmitted the Prolia fax on Besse's behalf.  The one-page fax stated that "Besse Medical is proud to offer Prolia" and touted "FREE Overnight Shipping on all PROLIA orders!"  *See* R. 1-1, Prolia Fax at 1, PID 15.  The ad also contained a blank order form, a fax number where completed orders could be sent, and a fine-print opt-out notice.  *Id.*

Although the fax was supposed to reach all 53,502 numbers on the Prolia List, WestFax's invoice records confirm that only 40,343, or 75% of the faxes, were transmitted successfully.  While this total number of actual Prolia fax recipients is known, the identity of each is not.  Typically after a fax blast, a fax broadcaster will retain fax logs, listing by fax number each intended recipient and whether that recipient received a successful transmission of the fax.  *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684–85 (7th Cir. 2013).  Here, however, the fax

logs no longer exist.  Sandusky did not sue Besse until three years after receiving the Prolia fax and by that time, neither Westfax nor Besse—who has an 18-month document retention policy—possessed a copy of the logs by which recipients could be identified.

Notwithstanding this roadblock, Sandusky Wellness Center claims it received the Prolia fax.  In 2013, it filed suit against Besse, claiming Besse violated the TCPA by sending an unsolicited fax with a non-compliant opt-out notice.  Following discovery, Sandusky sought certification of a putative class comprising all 40,343 persons who also allegedly received the fax.  In Sandusky's view, Besse was liable to this whole lot, with no need to distinguish between which faxes were unsolicited and which were solicited:  the statute itself provided redress for the former, and the Solicited Fax Rule covered the latter.

The district court, however, denied Sandusky's motion for class certification.  *See generally* R. 108, Memorandum Op. at 1–9, PID 24703–11.  It held that Sandusky's proposed class failed to satisfy Rule 23(b)(3) because two individualized issues—class member identity and consent—were central to the lawsuit and thus prevented "questions of law or fact common to class members [from] predominat[ing]."  Fed. R. Civ. P. 23(b)(3); R. 108, Memorandum Op. at 3–4, PID 24705–06.  As to class member identity, the district court concluded that, in the absence of fax logs, no classwide means existed by which to identify the 75% of individuals who received the Prolia fax, and thus were proper TCPA claimants, from the other 25%, who lacked standing to sue.  R. 108, Memorandum Op. at 4, PID 24706.  Without fax logs, the district court determined that "each potential class member would have to submit an affidavit certifying receipt of the Prolia fax."  *Id.* at 6, PID 24708.  Since the district court foresaw this becoming a highly individualized process, this counseled against class certification.

As to consent, the district court concluded that those fax recipients who had solicited the Prolia fax—i.e., consented to receiving it—did not have a valid claim against Besse since the FCC had granted Besse a retroactive waiver from complying with the Solicited Fax Rule.  *Id.* at 7–8. The district court noted that Besse had produced considerable evidence indicating that at least some intended Prolia fax recipients had indeed solicited the fax.  Thus, weeding out the solicited from the unsolicited fax recipients to discern proper class membership "would require manually cross-checking 450,000 potential consent forms [that established a fax was solicited]

against the 53,502 potential class members," another individualized inquiry that made class certification improper. *See id.* at 6–8, PID 24708–10.

As an alternative to denying Sandusky's motion on Rule 23(b)(3) predominance grounds, the district court also found that Sandusky's proposed class definition did not meet the implicit ascertainability requirement since identifying class members in the absence of fax logs was not "administratively feasible." *Id.* at 4–6, PID 24706–08. This appeal followed.

## II

As explained more fully below, we find no abuse of discretion in the district court's denial of class certification. First, the district court was correct to conclude that individualized questions of consent prevent common questions from predominating under Rule 23(b)(3). Although the district court credited the FCC's retroactive waiver for the need to distinguish between solicited and unsolicited Prolia faxes, the D.C.'s Circuit's intervening decision in *Bais Yaakov*, which invalidated the Solicited Fax Rule, provides alternative grounds for this differentiation. Second, the district court's recognition of the difficulty in identifying class members without fax logs and with sole reliance on individual affidavits was equally sufficient to preclude certification, regardless of whether this concern is properly articulated as part of ascertainability, Rule 23(b)(3) predominance, or Rule 23(b)(3) superiority.

## A

We review the district court's denial of class certification for an abuse of discretion. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012). In the class action context, a district court is given "substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation." *Rikos*, 799 F.3d at 504 (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559 (6th Cir. 2007)). Therefore, our review is "very limited," and we will reverse "only if a strong showing is made that the district court clearly abused its discretion." *Young*, 693 F.3d at 536.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To merit certification, a putative class must satisfy the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequate representation—plus fit within one of the three types of classes listed in Rule 23(b). *Young*, 693 F.3d at 537. Rule 23(b)(3) classes—the kind at issue here—must meet predominance and superiority requirements, that is, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members" and class treatment must be "superior to other available methods." Fed. R. Civ. P. 23(b)(3). In addition, Rule 23(b)(3) classes must also meet an implied ascertainability requirement. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). It is the party seeking class certification—here, Sandusky—that bears the burden of "affirmatively demonstrat[ing]" compliance with Rule 23. *Wal-Mart*, 564 U.S. at 350.

**B**

The district court determined that questions of consent presented an individualized issue. *See* R. 108, Memorandum Op. at 6–9, PID 24708–11. Acknowledging that the FCC had retroactively waived Besse's liability for failure to comply with the Solicited Fax Rule, it concluded that Besse had a valid defense as to the solicited Prolia fax recipients—they were not proper class claimants. *See id.* at 7, PID 24709. Identifying these individuals, however, entailed combing through hundreds of thousands of customer forms that Besse had produced as evidence of consent, a recipient-by-recipient inquiry that was prohibitive of class certification. *Id.* at 8, PID 24710.

**1**

While the district court assumed the FCC's retroactive waiver exempted Besse from liability for sending solicited Prolia faxes, the intervening D.C. Circuit decision striking down the Solicited Fax Rule means reliance on this waiver is no longer necessary. Instead, the invalidation of the Rule altogether confirms the district court's conclusion that Besse cannot be liable to any individuals who solicited the Prolia fax. *See Bais Yaakov*, 852 F.3d at 1083

(holding the Solicited Fax Rule "unlawful to the extent that it requires opt-out notices on solicited faxes").

Once the Multidistrict Litigation Panel assigned petitions challenging the Solicited Fax Rule to the D.C. Circuit, that court became "the sole forum for addressing . . . the validity of the FCC's rule[]." *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008) (quoting *MCI Telecomms. Corp. v. U.S. West Comms.*, 204 F.3d 1262, 1267 (9th Cir. 2000)). And consequently, its decision striking down the Solicited Fax Rule became "binding outside of the [D.C. Circuit]." *Id.* This result makes sense in light of the procedural mechanism Congress has provided for challenging agency rules. *See* 28 U.S.C. §§ 2112, 2342–43. By requiring petitioners to first bring a direct challenge before the FCC, the statute allows this expert agency to weigh in on its own rules, and by consolidating petitions into a single circuit court, the statute promotes judicial efficiency and ensures uniformity nationwide. *See CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010). Thus, since the Solicited Fax Rule is no longer valid, the district court would reach the same conclusion as it did initially: that questions of consent present individualized issues counseling against class certification.

Sandusky contends that the district court is not bound by *Bais Yaakov*. Its argument is as follows: The D.C. Circuit struck down *only* the FCC's 2014 Order validating the Solicited Fax Rule. That order applied *only* to specific petitioners. Besse did not petition the FCC for relief from the Rule until later, and *its* denial came in the 2015 Order. Thus, according to Sandusky, this court must assume the Solicited Fax Rule's validity until the 2015 Order is separately (and successfully) challenged in a circuit court. *See* App. R. 34, Sandusky Rule 28(j) Letter at 1–2. Sandusky misreads the breadth of the D.C. Circuit decision. That court was clear that the "Solicited Fax Rule is unlawful" and vacated the 2014 Order because it "interpreted and applied [that Rule]." *Bais Yaakov*, 852 F.3d at 1083. Thus, it was the Solicited Fax Rule itself that was struck down, which is itself an "order." *See Leyse v. Clear Channel Braod., Inc.*, 545 F. App'x 444, 455 (6th Cir. 2013) (citing *Columbia Broad. Sys., Inc. v. United* States, 316 U.S. 407 (1942)). Since the 2015 Order likewise "interpreted and applied [the Solicited Fax Rule]," that order is also no longer good law post-*Bais Yaakov*. Moreover, the 2015 Order purported to "follow[] the Commission's 2014 fax opt-out notice order." 2015 Order, 30 F.C.C.R. at 8598.

Thus, Sandusky's argument that the district court would be required to turn a blind eye to the D.C. Circuit decision invalidating the Solicited Fax Rule, and instead follow the 2015 Order that relies on an abrogated rule, is without merit.

**2**

Not only was the district court correct to identify consent as presenting individualized questions, such questions were sufficient to keep common questions from predominating and preclude certification under Rule 23(b)(3). This rule provides that "questions of law or fact common to class members must predominate over any questions affecting only individual members." In discerning whether a putative class meets the predominance inquiry, courts are to assess "the legal or factual questions that qualify each class member's case as a genuine controversy," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and assess whether those questions are "subject to generalized proof, and thus applicable to the class as a whole," *Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016) (internal citation omitted). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016). Plaintiffs need not prove that every element can be established by classwide proof. *Bridging Cmtys.*, 843 F.3d at 1124. But the key is to "identify[] the substantive issues that will control the outcome," in other words, courts should "consider how a trial on the merits would be conducted if a class were certified." *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quotation marks omitted).

Here, if Sandusky's 40,343-member class were certified, the district court would be tasked with filtering out those members to whom Besse was not liable—those individuals who solicited the Prolia fax. Regardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation. *See id.* In other words, "one substantive issue undoubtedly will determine how a trial on the merits will be conducted if the proposed class is certified." *Id.* at 327. "This issue . . . is whether [Besse's] fax advertisements were transmitted without the prior express invitation or permission of each recipient. Thus, the predominant issue of fact is undoubtedly one of *individual* consent." *Id.*

The undertaking is individualized because Besse produced evidence that "several thousand" individuals on the Prolia List of intended fax recipients are "current or former Besse customers." *See* App. R. 18, Decl. of Eric Besse ¶¶ 5, 9, APX 0002–03. This evidence consisted of over 450,000 pages of various forms where customers had provided Besse with their fax numbers. *See, e.g., id.* ¶ 9, Exhs. 1, 7, and 13, APX 0003, 0022, 0034, and 0047. Upon review of a sample of these documents, the district court concluded that many forms would demonstrate that these customers—if their names also appeared on the Prolia List—had given the requisite consent, or "prior express invitation or permission," to receive the fax, and thus would not have valid claims against Besse. R. 108, Memorandum Op. at 8, PID 24710. But identifying these individuals "would require manually cross-checking 450,000 potential consent forms against the 53,502 potential class members." *Id.* Identifying solicited fax recipients through a form-by-form inquiry is sufficiently individualized to preclude class certification.

This court's decision in *Bridging Communities, Inc. v. Top Flite Financial, Inc.* does not require otherwise. In that junk fax case, we held that "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)." *Bridging Cmtys.*, 843 F.3d at 1126. But there, the defendant had simply "raised the possibility" that "individual class members *might* have solicited or consented to receiving the challenged faxes." *Id.* at 1123, 1125 (emphasis added). And, we were "unwilling to allow such speculation and surmise to tip the decisional scales in a class certification ruling." *Id.* at 1125 (internal quotation marks omitted). Here, by contrast, Besse has produced concrete evidence of consent, evinced by hundreds of thousands of customer documents, some of which we know for certain match the names of individuals on the Prolia List. Reviewing these documents, discerning which provide the requisite consent, and then manually cross-checking each individual customer name against the Prolia List—with a match indicating Besse has a valid defense as to that individual—is no hypothetical scenario. Were the class certified, this undertaking would be a tangible reality for the district court, sufficiently distinguishing the facts of this case from the mere "speculation and surmise" that existed in *Bridging Communities*.

Sandusky makes two additional arguments as to why consent evidence should not prevent certification. First, Sandusky argues that there is actually a class-wide absence of consent since

Besse compiled its Prolia List using fax numbers obtained from third-party data provider, InfoUSA. It would have us hold that "if a fax sender is buying a list of fax numbers from a third party, then it cannot have prior express permission as a matter of law." *See* Appellant Br. at 30; *see also Bridging Cmtys.*, 843 F.3d at 1126 (recognizing the possibility that in cases "where . . . a sender 'obtained all of the fax recipients' fax numbers from a single purveyor of such information' there exists a 'class-wide means of establishing the lack of consent based on arguably applicable federal regulations'") (quoting *Gene & Gene LLC*, 541 F.3d at 327–28).

This argument is unavailing. Besse's enlistment of a third party to send the Prolia fax on its behalf does not somehow negate previous consent. Perhaps Besse risked a lack of consent by relying on this data collector initially, but its ability to produce later consent evidence saves Besse from this downfall. The case Sandusky cites in support—a district court case—is inapposite. *See Siding & Insulation Co. v. Combined Ins. Grp. Ltd., Inc.*, No, 1:11 CV 1062, 2012 WL 1425093 (N.D. Ohio 2012). Unlike the voluminous consent evidence in the record before us, in *Siding & Insulation* there was "nothing in the record to support the claim that any of the recipients consented to receiving the fax." *Id.* at *3. Therefore, in that case it may very well have been reasonable for the court to assume a universal lack of consent.

Additionally, no "arguably applicable federal regulation[s]" compel a different conclusion. One regulation that Sandusky cites, 47 C.F.R. § 64.1200(a)(4)(ii)(B), states that if a "sender obtains the facsimile number from [a commercial database], the sender must take reasonable steps to verify that the recipient agreed to make the number available for public distribution." Presumably Sandusky's argument is that Besse did not verify consent *before* sending the Prolia fax, so it was in violation of this regulation. However, this regulation applies only to the senders of *unsolicited* faxes. 47 C.F.R. § 64.1200(a)(4) (prohibiting "[u]se of a telephone facsimile machine, computer, or other device to send an *unsolicited* advertisement") (emphasis added). Since there is evidence that Besse had already obtained consent from certain individuals on the Prolia List, the faxes sent to those individuals by definition could not have been unsolicited. Besse did not simply cull fax numbers from one purchased database. Although it utilized the InfoUSA list in compiling its list of recipients, many of those recipients

had in fact already provided their fax numbers to Besse and consented to receive advertisements. *Cf. Gene & Gene LLC*, 541 F.3d at 329.

Sandusky's second contention, as stated by counsel at oral argument, is that the district court should have certified the class and then created subclasses based on the different types of consent forms produced. According to counsel, he would then proceed subclass-by-subclass and prove that none of the evidence Besse produced actually amounted to consent under the Act. However, it was not an abuse of discretion for the district court to deny counsel this opportunity. *See* Fed. R. Civ. P. 23(c)(5) (stating that only "[w]hen appropriate, a class may be divided into subclasses"). To even create subclasses would have required the district court to analyze each individual form, and further assumes that the forms could be easily categorized. And after this painstaking sorting process, allowing Sandusky to then litigate the validity of consent as to each subclass would result in the exact "myriad mini-trials" that Rule 23(b)(3) seeks to prevent. *See Gene & Gene, LLC*, 541 F.3d at 329.

Because Besse presented actual evidence of consent to the district court, which required the need for individualized inquiries in order to distinguish between solicited and unsolicited Prolia faxes, the district court did not abuse its discretion in denying class certification on these grounds.

## C

In addition to issues surrounding consent, the district court premised its denial of certification on the inability to identify class members. In its view, this difficulty was a problem for Sandusky under both Rule 23(b)(3) predominance and ascertainability. Sandusky's proposed class consisted of "[a]ll persons who were successfully sent [the Prolia fax]." R. 91 at 12; R. 107. But while Besse intended the fax to be sent to all 53,502 individuals and entities on the Prolia List, only 40,343 actually received it. Both parties agreed that the 25% who did not receive the Prolia fax are not valid class members. In the absence of fax logs listing the status of each attempted transmission, the district court resolved that "each potential class member would have to submit an affidavit certifying receipt of the Prolia fax. Given that the fax was sent in 2010, the recollection of a putative class member that he, she, or it had received a particular

unsolicited fax would be somewhat suspect." R. 108, Memorandum Op. at 6, PID 24708. Thus, it concluded that using affidavits to identify class members was yet a second individual issue that prevented common questions from predominating, and reliance on these 7-year-old, self-serving statements was not an "administratively feasible" way to ascertain class membership.[1] *Id.* at 4–5, PID 24706–07.

On appeal, Sandusky argues that difficulties in identifying class members are not relevant to either ascertainability or Rule 23(b)(3) predominance; in its view, this concern should be accounted for under Rule 23(b)(3)'s superiority prong, which requires courts to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Analyzing superiority entails balancing the "the desirability" of class treatment with "the likely difficulties in managing a class action," among other things. *Id.* So although scrutinizing individual affidavits may be burdensome, Sandusky argues that these burdens are outweighed by the benefits of affording its TCPA claim class action treatment, which include furthering the deterrent purposes of the TCPA and ensuring that Besse does not walk away from its alleged wrongdoings scot-free. According to Sandusky, if the district court had conducted this balancing inquiry, rather than relying on predominance or ascertainability, it would have certified Sandusky's proposed class.

We disagree. Even if Sandusky is correct that class member identity is properly analyzed under Rule 23(b)(3) superiority—something we do not decide—it would not have been an abuse of discretion for the district court to conclude that class action treatment was not the superior method for resolving Sandusky's claim. To be sure, courts have been inconsistent in how they have accounted for difficulties in identifying class members, especially within the context of the TCPA. Some consider it when deciding whether common questions of law or fact predominate. *See, e.g., Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 685 (7th Cir. 2013) (concluding that fax logs listing the fax numbers of each individual who received the fax obviated the "need for recipient-by-recipient adjudication," and consequently, "the district court did not err in

---

[1]On appeal, Sandusky argues that class members could submit copies of the fax as proof of receipt, as Sandusky has done. However, even after discovery Sandusky produced no evidence that other fax recipients still possessed copies of the Prolia fax. And more importantly, Sandusky did not argue this point below, so we deem it forfeited. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

concluding that the questions of law or fact common to class members predominate over any questions affecting only individual members") (internal quotation marks omitted).

Other courts frame it as a question of ascertainability. In order to meet Rule 23(b)(3)'s implied ascertainability requirement, a "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young*, 693 F.3d at 537–38 (citing 5 James W. Moore et al., *Moore's Federal Practice* § 23.21[1] (Matthew Bender 3d ed. 1997)). In the context of the TCPA, where fax logs have existed listing each successful recipient by fax number, our circuit has concluded that such a "record in fact demonstrates that the fax numbers are objective data satisfying the ascertainability requirement." *See Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014).

Recently, the Second Circuit affirmed a district court's denial of class certification on ascertainablity grounds under similar circumstances as present here. *See Leyse v. Lifetime Entm't Servs., Inc.*, No. 16-1133-cv, 2017 WL 659894 (2d Cir. Feb. 15, 2017). In *Leyse*, the plaintiffs brought a putative class action against Lifetime for violating the TCPA by making a series of unlawful, prerecorded telephone calls. *Id.* at *2. They proposed identifying class members through soliciting affidavits from individuals who would testify to receipt of the calls. *Id.* The district court concluded—and the Second Circuit affirmed—that this was not an ascertainable way to identify class members given "(1) no list of the called numbers existed; (2) no such list was likely to emerge; and (3) [] proposed class members could not realistically be expected to recall a brief phone call received six years ago or . . . to retain any concrete documentation of such receipt." *Id.* (internal citations and quotation marks omitted). These ascertainability concerns mirror the ones present here where (1) fax logs no longer exist; (2) they are not likely to emerge; and (3) Prolia fax recipients are not realistically expected to remember receiving a one-page fax sent seven years ago.

And still other courts take a dual-approach, considering both predominance and ascertainability in tandem, much like the district court did here. *See Medtox*, 821 F.3d at 997–98 (finding that "whether a class member received the unsolicited fax" was a common question of fact that predominated when fax logs existed to identify recipients and that "fax logs showing the

numbers that received each fax are objective criteria that make the recipient [class member] clearly ascertainable").

Outside the context of the TCPA, two sister circuits have cautioned against an aggressive take on ascertainability, and have instead concluded, as Sandusky advocates, that class member identity concerns should be taken into account under Rule 23(b)(3) superiority. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015) (declining to reverse district court decision finding that a putative class of all purchasers of Instaflex within the relevant time period was clearly ascertainable despite the fact that affidavits alone might be the only means of identifying class members); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) (rejecting ConAgra's argument that there was no administratively feasible way of identifying putative class of Wesson Oil purchasers who were unlikely to have proof of purchase, and affirming certification of class because it was defined by objective criteria). Moreover, *Mullins* and *Briseno* suggest that utilizing affidavits alone as a mechanism to identify class members need not be a barrier to class certification under Rule 23's implied ascertainability requirement. *Mullins*, 795 F.3d at 658, 672; *Briseno*, 844 F.3d at 1132; *cf. Carrera v. Bayer Corp.*, 727 F.3d 300, 309–12 (3d Cir. 2013) (suggesting that use of affidavits is *insufficient* to satisfy the ascertainability requirement).

As this synopsis indicates, courts have categorized class member identity concerns differently within Rule 23's framework. And the district court's decision to account for it under ascertainability and predominance does find some support in the case law. However, we see no need to add our own opinion to this debate. For even assuming Sandusky is correct that difficulties in identifying class members should be considered as part of Rule 23(b)(3) superiority, the facts of this case present a situation where the class device is not "superior to other available methods" due to "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Thus, we may affirm the district court on this alternative ground. *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 786 (6th Cir. 2016).

As a general matter, the district court does not know who received the Prolia fax. The fax logs no longer exist. Yet we know that 13,159 individuals on the Prolia List do not have valid claims against Besse. Sandusky has proposed no method for weeding out these individuals,

who comprise approximately 25% of all intended recipients. The district court recognized that its own proffered solution—having class members submit individual affidavits testifying to receipt of the Prolia fax—was not feasible, concluding that the reliability of an individual's recollection of having received a seven-year-old, single-page fax would be dubious at best. Furthermore, it is possible that all 53,502 intended recipients might submit affidavits claiming receipt of the Prolia fax and their entitlement to $500 in damages. Finding out which quarter of these individuals were being untruthful would require scrutinizing each affidavit and would undoubtedly be a difficult undertaking. In fact, it may not even be possible, in which case the district court would be tasked with fashioning some type of reduced equitable relief for all recipients. Practical concerns such as these highlight the difficulties the district court would have in managing Sandusky's proposed class and further underscore the inappropriateness of class certification.

To our knowledge, no circuit court has ever mandated certification of a TCPA class where fax logs did not exist, and we decline to be the first. Sandusky cites exclusively out-of-circuit district court cases as examples of when TCPA classes have been certified despite missing fax logs. *See* Appellant Br. at 13–14. But while the district courts in those cases may have determined, given the specific facts presented, that classwide treatment was manageable, the district court's opposite conclusion in this case was not an abuse of discretion.

The two non-TCPA circuit court cases relied on by Sandusky—*Mullins* and *Briseno*—suggest that a district court may rely on affidavits to identify class members, but they do not mandate that it must do so. Notably, both of those cases *affirmed* lower court decisions certifying a class, where the district court had concluded that it was manageable to rely on affidavits to identify class members. Here, in contrast, the district court came to the opposite conclusion. We think this difference in procedural posture is important given the "substantial discretion" we afford district courts in choosing whether to certify a class and our subsequent "very limited" review of that decision. *Rikos*, 799 F.3d at 504; *Young*, 693 F.3d at 536. Finally, even *Mullins* contemplates that "[a] plaintiff's failure to address the district court's concerns adequately [with regards to difficult manageability problems] may well cause the plaintiff to

flunk the superiority requirement of Rule 23(b)(3)." *See Mullins*, 795 F.3d at 672. That is exactly the scenario we have here.

While class certification may be "normal" under the TCPA, *see* Appellant Br. at 8 (quoting *Turza*, 728 F.3d at 683), that does not mean it is automatic. While there may be several benefits to affording TCPA cases class treatment—for example, as a way to hold businesses accountable when smaller recovery values provide fewer incentives for solo claims—those benefits do not always outweigh the difficulties of managing a proposed class. Sandusky waited three years after receipt of the one-page Prolia fax to sue Besse for failing to include a properly worded opt-out notice. It did so when fax logs no longer existed to identify each recipient and without a proposed alternative for identifying class members. Perhaps if Sandusky had brought suit earlier, fax logs would have existed, and their absence would not pose an independent barrier to class certification. Or, Sandusky could have filed an individual claim against Besse and presented a copy of the Prolia fax as evidence of receipt. Instead, Sandusky did neither of these things. By choosing to file a class action when it did, Sandusky shouldered the burden of proving that its proposed class satisfied Rule 23. It simply did not meet that burden here. In sum, we conclude that the difficulty of identifying class members in the absence of fax logs was a separate and valid concern recognized by the district court that precluded class certification.

**III**

For the foregoing reasons, we **AFFIRM** the district court's denial of class certification.